## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **UNITED STATES SECURITIES AND EXCHANGE COMMISSION,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No. 21-CV-8085** |
| **JOSE LUIS CASERO SANCHEZ,** | |
| **Defendant,** | *Filed Ex Parte* |
| **and** | |
| **JOSE LUIS CASERO ABELLAN, and MARIA ISABEL SANCHEZ GONZALEZ,** | |
| **Relief Defendants.** | |

## PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S MEMORANDUM OF LAW IN SUPPORT OF ITS *EX PARTE* APPLICATION FOR A TEMPRORARY RESTRAINING ORDER FREEZING ASSETS AND GRANTING OTHER RELIEF, AND FOR AN ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT BE ISSUED

Joseph G. Sansone
Assunta Vivolo
NY 4213153
David W. Snyder*
Christopher M. Colorado
Counsel for the Plaintiff
U.S. Securities and Exchange Commission
Philadelphia Regional Office
1617 JFK Boulevard, Suite 520
Philadelphia, Pennsylvania 19103
(215) 597-1047 (Vivolo)

September 29, 2021

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF FACTS .................................................................................................... 2

A.  Sanchez's Role as a Senior Compliance Analyst Provided Him With Access
    to Material, Nonpublic Information Concerning the Investment Bank's Clients .............. 2

B.  The Investment Bank's Policies Prohibited Sanchez From Executing Personal
    Securities Trades on the Basis of Confidential Information ................................................. 4

C.  Sanchez Violated the Investment Bank's Policies Regarding Brokerage Accounts
    and Personal Trading ......................................................................................................... 6

D.  Sanchez Traded Based On Material Nonpublic Information ................................................. 6

    1.  Sanchez's Trading in the Gonzalez Interactive Brokers Account ........................... 7

    2.  Sanchez's Trading in the Abellan Schwab Account ................................................ 9

    3.  Sanchez's Trading in the Gonzalez Tastyworks Account ...................................... 10

    4.  Sanchez's Trading in the Abellan Interactive Brokers Account ............................ 13

    5.  The Investment Bank Interviewed Sanchez and He Withdrew Illegal Profits
        From the Abellan Interactive Brokers Account ...................................................... 14

ARGUMENT ......................................................................................................................... 15

I.  THE COURT SHOULD FREEZE SANCHEZ'S ASSETS ............................................. 15

    A.  The SEC's Burden in Seeking an Asset Freeze Is Not Onerous ........................... 15

    B.  The Commission Is Likely to Succeed in Proving That Sanchez Violated
        Section 17(a) of the Securities Act,  Section 10(b) of the Exchange Act,
        and Exchange Act Rule 10b-5 .............................................................................. 17

        1.  The Information Sanchez Possessed Was Both Material and
            Nonpublic ................................................................................................. 18

        2.  Sanchez Misappropriated or Misused the Information by Trading
            on It .......................................................................................................... 20

        3.  Sanchez Breached Duties of Trust and Confidence That He Owed
            to the Investment Bank and Its Clients .................................................... 22

        4.  Sanchez Acted With Scienter ................................................................... 24

C.     The Commission Is Likely to Succeed in Proving That Sanchez Violated Section 14(e) of the Exchange Act and Rule 14e-3 Thereunder ......................... 26

D.     An Asset Freeze Is Appropriate Under the Circumstances ................................. 28

     1.     The Court Should Freeze Sanchez's Assets in the Subject Accounts Because a Serious Risk Exists that Sanchez Will Move Them Beyond the Court's Reach ...................................................................................... 28

     2.     The Court Should Also Issue an Order Freezing Any Relief Defendants' Assets in the Subject Accounts ............................................ 31

II.     THE COURT SHOULD PROHIBIT THE DESTRUCTION OF DOCUMENTS AND AUTHORIZE EXPEDITED DISCOVERY ......................................... 32

III.     THE COURT SHOULD AUTHORIZE ALTERNATIVE SERVICE OF ALL PAPERS RELATED TO THE MOTION, ORDER OF THE COURT, AND EXPEDITED DISCOVERY DEMANDS UPON DEFENDANTS ................................ 33

IV.     THE COURT SHOULD ORDER THE DEFENDANTS TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT BE ENTERED .............................. 36

V.     ENTRY OF AN *EX PARTE* TEMPORARY RESTRAINING ORDER IS APPROPRIATE ................................................................................................. 37

CONCLUSION .................................................................................................. 37

# TABLE OF AUTHORITIES

**CASES**                                                                                    **Page(s)**

*Basic v. Levinson*,
    485 U.S. 224 (1988).................................................................................................18

*Chiarella v. United States*,
    445 U.S. 222 (1980).................................................................................................17

*Dirks v. SEC*,
    463 U.S. 646, 659 (1983)................................................................................17, 18, 22

*Ernst & Ernst v. Hochfelder*,
    425 U.S. 185 (1976).................................................................................................24

*FTC v. Pecon Software Ltd.*,
    No. 12-CV-7186 (PAE), 2013 WL 4016272 (S.D.N.Y. Aug. 7, 2013)............................34

*In re GLG Life Tech Corp. Securities Litigation*,
    287 F.R.D. 262 (S.D.N.Y. 2012) .............................................................................34

*Herman & MacLean v. Huddleston*,
    459 U.S. 375 (1983).................................................................................................24

*Madu, Edozie & Madu, P.C. v. SocketWorks Ltd. Nigeria*,
    265 F.R.D. 106 (S.D.N.Y. 2010) .............................................................................34

*Rio Props. Inc. v. Rio Int'l Interlink*,
    284 F.3d 1007 (9th 2002).........................................................................................34

*Rolf v. Blyth, Eastman Dillon & Co.*,
    570 F.2d 38 (1978)...................................................................................................24

*SEC v. Ahmed*,
    No. 15-CV-00675 (JBA) (D. Conn. June 17, 2015) .......................................................33

*SEC v. Aly*,
    No. 16-CV-3853 (PGG) (S.D.N.Y. May 24, 2016) ...................................................33, 35

*SEC v. Anticevic*,
    No. 05-CV-6991 (KMW), 2005 WL 1939946 (S.D.N.Y. Aug. 5, 2005)...................29, 34

*SEC v. Anticevic*,
    No. 05-CV-6991 (KMW), 2009 WL 361739, at *3 (S.D.N.Y. Feb. 13, 2009) ...............33

**CASES (cont'd)**                                                                                              **Page(s)**

*SEC v. Anticevic*,
   No. 05-CV-6991 (KMW), 2010 WL 2077196 (S.D.N.Y. May 14, 2010) .......................26

*SEC v. Byers*,
   No. 08-CV-7104 (DC), 2009 WL 33434 (S.D.N.Y. Jan 7, 2009 .....................................15

*SEC v. Cavanagh*,
   155 F.3d 129 (2d Cir. 1998)..........................................................................................31

*SEC v. Cohen*,
   No. 19-CV-9645 (CM), Dkt. No. 3 (S.D.N.Y. Oct. 22, 2019) ..........................................35

*SEC v. Compania Internacional Financiera S.A.*,
   No. 11-CV-4904 (DLC), 2011 WL 3251813 (S.D.N.Y. July 29, 2011) .................... 15-16

*SEC v. Credit Bancorp. Ltd.*,
   No. 99-CV-11395, 2010 WL 768944 (S.D.N.Y. Mar. 8, 2010)........................................15

*SEC v. Cuban*,
   620 F.3d 551, 554 (5th Cir. 2010)  ...............................................................................22

*SEC v. Downe*,
   No. 92-CV-4092 (PKL), 1993 WL 22126 (S.D.N.Y. 1993) .............................................22

*SEC v. Dubovoy*,
   No. 15-CV-6076, 2015 WL 6122261 (D.N.J. Oct. 16, 2015) ....................................16, 29

*SEC v. Ganamaneni, et al.*,
   No. 18-CV-11390 (ALC) (S.D.N.Y. Dec. 6, 2019) .........................................................33

*SEC v. Gonzalez de Castilla*,
   145 F. Supp. 2d 402 (S.D.N.Y. 2001)............................................................17, 18, 22, 29

*SEC v. Hedén*,
   51 F. Supp. 2d 296 (S.D.N.Y. 1999)..............................................................................30

*SEC v. Infinity Group*,
   212 F.3d 180 (3d Cir. 2000)...........................................................................................15

*SEC v. Lybrand*,
   No. 00-CV-1387 (SHS), 2000 WL 913894 (S.D.N.Y. July 6, 2000)...............................32

*SEC v. Lyon*,
   529 F. Supp. 2d 444, 453 (S.D.N.Y. 2008) ....................................................................16

**CASES (cont'd)** **Page(s)**

*SEC v. Lyon*,
    605 F. Supp. 2d 531 (S.D.N.Y. 2009) ...............................................................21

*SEC v. Maillard*,
    No. 13-CV-5299(VEC), 2014 WL 1660024 (S.D.N.Y. Apr. 23, 2014)...........15

*SEC v. Management Dynamics, Inc.*,
    515 F. 2d 801 (2d Cir. 1975)..........................................................................15

*SEC v. Manor Nursing Centers, Inc.*,
    458 F.2d 1082 (2d Cir. 1972).........................................................................14

*SEC v. Materia*,
    745 F.2d 197 (2d Cir. 1984)...........................................................................18

*SEC v. Mayhew*,
    121 F.3d 44 (2d Cir. 1997).......................................................................18, 27

*SEC v. Monarch Funding Corp.*,
    192 F.3d 295 (2d Cir. 1999).........................................................................17

*SEC v. Musella*,
    578 F. Supp. 425 (S.D.N.Y. 1984).................................................................27

*SEC. v. Obus*,
    693 F.3d 276 (2d Cir. 2012)................................................................. *passim*

*SEC v. One or More Unknown Traders in Securities of Bioverativ, Inc.*,
    No. 18-CV-00701(JGK), 2018 WL 2244465 (S.D.N.Y. Feb. 9, 2018)............30

*SEC v. One or More Unknown Traders in Securities of General Communication, Inc.*,
    No. 17-CV-2659 (KPF), 2017 WL 1407514 (S.D.N.Y. Apr. 13, 2017) ............... 32-33

*SEC v. One or More Unknown Traders in Securities of Onyx Pharmaceuticals, Inc.*,
    No. 13-CV-4645 (JPO), 2014 WL 5026153 (S.D.N.Y. Sept. 29, 2014) ...........21

*SEC v. Pointer Worldwide Ltd.*,
    No. 09-CV-6162 (DLC) (S.D.N.Y. July 23, 2009).........................................35

*SEC v. Sargent*,
    229 F.3d 68 (1st Cir. 2000)...........................................................................26

*SEC v. Schiffer*,
    No. 97-CV-5853 (RO), 1998 WL 307375 (S.D.N.Y. June 11, 1998)..............30

**CASES (cont'd)**                                                              **Page(s)**

*SEC v. Sekhri*,
   No. 98-CV-2320 (RPP), 2002 WL 31100823 (S.D.N.Y. July 22, 2002) ...................18, 19

*SEC v. Singer*,
   786 F. Supp. 1158 (S.D.N.Y.1992)................................................................................24

*SEC v. Spongetech Delivery Systems*,
   No. 10-CV-2031 (DLI), 2011 WL 887940 (E.D.N.Y. Mar. 14, 2011) ............................32

*SEC v. Suman*,
   684 F. Supp. 2d 378 (S.D.N.Y. 2010)............................................................................20

*SEC v. Unifund SAL*,
   910 F.2d 1028 (2d Cir. 1990).........................................................................15, 30, 32, 35

*SEC v. Warde*,
   151 F.3d 42 (2d Cir. 1998)........................................................................................19, 21

*SEC v. Well Advantage Ltd.*,
   No. 12-CV-5786 (RJS) (S.D.N.Y. Aug. 22, 2012)..........................................................29

*Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
   495 F.2d 228 (2d Cir. 1974)...........................................................................................18

*Smith v. SEC*,
   653 F.3d 121 (2d Cir. 2011)...........................................................................................15

*United States v. Chestman*,
   947 F.2d 551 (2d Cir. 1991).....................................................................................22, 26

*United States v. First National City Bank*,
   379 U.S. 378 (1965).......................................................................................................30

*United States v. Larrabee*,
   240 F.3d 18 (1st Cir. 2001).............................................................................................21

*United States v. Lebanese Canadian Bank SAL*,
   285 F.R.D. 262 (S.D.N.Y. 2012) ...................................................................................34

*United States v. Newman*,
   773 F.3d 438 (2d Cir. 2014)...........................................................................................17

*United States v. O'Hagan*,
   521 U.S. 642 (1997).......................................................................................................23

**CASES (cont'd)**                                                                      **Page(s)**

*United States v. Whitman*,
    904 F. Supp. 2d 363 (S.D.N.Y. 2012)...........................................................................17, 23

## STATUTES, RULES, AND OTHER AUTHORITIES

Advisory Committee Notes to the 1993 amendments to Rule 26(d) ...........................................33

Fed. R. Civ. P. 26(d) ...............................................................................................................33

Fed. R. Civ. P. 29 ....................................................................................................................33

Fed. R. Civ. P. 30(a) ...............................................................................................................33

Fed. R. Civ. P. 33(b) ...............................................................................................................33

Fed. R. Civ. P. 34(b) ...............................................................................................................33

Fed. R. Civ. P. 36(a) ...............................................................................................................33

Fed. R. Civ. P. 65(b)(2).....................................................................................................35, 36

Securities Act of 1933 § 17(a) [15 U.S.C. § 77q].............................................................16, 17

Securities Exchange Act of 1934 § 10(b) [15 U.S.C. § 78j(b)].....................................16, 17, 26

Securities Exchange Act of 1934 § Rule 10b–5 [17 C.F.R. § 240.10b-5].....................16, 17, 26

Securities Exchange Act of 1934 § 14(e) [15 U.S.C. § 78n(e)].....................................16, 26, 27

Securities Exchange Act of 1934 § Rule 14e-3 [17 C.F.R. § 240.14e-3].......................16, 26, 27

Plaintiff Securities and Exchange Commission ("Commission") respectfully submits this memorandum of law in support of its *ex parte* emergency application, by proposed order to show cause, against defendant Jose Luis Casero Sanchez ("Sanchez") and relief defendants Jose Luis Casero Abellan ("Abellan") and Maria Isabel Sanchez Gonzalez ("Gonzalez," collectively with Sanchez and Abellan, "Defendants").  The Commission seeks a temporary restraining order pending a preliminary injunction:  (1) freezing Defendants' assets based in the United States; (2) preventing the destruction of documents; (3) ordering expedited discovery; (4) authorizing alternative service of any Order of the Court, all related pleadings and papers, including the Complaint, and expedited discovery demands; and (5) ordering Defendants to show cause why a preliminary injunction should not be entered extending this temporary relief pending a final decision on the merits.

## PRELIMINARY STATEMENT

This case involves repeated acts of insider trading by defendant Sanchez, who abused his position of trust as a Senior Analyst in the Compliance Division of a prominent United States-based investment bank ("Investment Bank") to reap hundreds of thousands of dollars in illegal trading profits.  The Investment Bank entrusted Sanchez with access to material, nonpublic information concerning all pending and potential transactions in which the Investment Bank was involved and advising clients, including mergers, tender offers, and financings.  Sanchez was given this broad access to highly sensitive information so that, as a compliance analyst, he could assist the Investment Bank's efforts to ensure that employees kept the information confidential and did not engage in insider trading.  Instead, Sanchez used his access to engage in illegal insider trading for his own benefit, breaching his duties to the Investment Bank and its clients.  Moreover, Sanchez attempted to conceal his illegal activity by effecting his trades in four

brokerage accounts nominally held in the names of his parents, Abellan and Gonzalez (the "Relief Defendants"), but which Sanchez controlled.  Ultimately, between September 2020 and May 2021, Sanchez used these United States-based brokerage accounts to trade securities on United States exchanges before at least *45* significant transactions advised by or otherwise involving the Investment Bank, realizing approximately $471,700 in profits.

The Commission asks the Court for *ex parte* emergency relief preventing Defendants—Spanish citizens believed to be living in Spain—from moving assets, including Sanchez's illegal insider trading proceeds, out of the United States and beyond this Court's jurisdiction.  The asset freeze is necessary to preserve the Commission's ability to recover disgorgement and penalties for Sanchez's fraud and to ensure Defendants do not move ill-gotten gains beyond the reach of this Court.  In furtherance of this relief, the Commission also asks the Court to prohibit the destruction of evidence; grant expedited discovery; authorize alternative service of all papers related to the Motion, orders of the Court, the Complaint, and expedited discovery; and enter an order to show cause why a preliminary injunction should not be granted.

## STATEMENT OF FACTS

**A.**   **Sanchez's Role as a Senior Compliance Analyst Provided Him With Access to Material, Nonpublic Information Concerning the Investment Bank's Clients**

From September 2019 to May 2021, Sanchez worked as a Senior Analyst in the Investment Bank's Compliance Division.  (*See* Declaration of John S. Rymas, dated September 29, 2021 ("Rymas Decl."), ¶ 7.)  Within the Investment Bank's Compliance Division, Sanchez worked in the "Control Room" in Warsaw, Poland, one of eight Control Rooms the Investment Bank maintains globally.  (*Id.* ¶¶ 7, 10, 21.)  In that role, Sanchez had direct access to material, nonpublic information regarding the Investment Bank's clients and certain of their counterparties.  (*Id.* ¶¶ 20-26.)

2

The Investment Bank's Control Rooms are primarily responsible for preserving the integrity of the Investment Bank's information barriers by monitoring and controlling the flow of confidential information between the Investment Bank's private-side advisory business (*e.g.*, Investment Banking) and the public side business (*e.g.*, Sales, Trading, Research, and Investment Management).  (*Id.* ¶ 21.)  Among other things, the Control Rooms maintain a confidential internal database ("Confidential Database") that tracks material details regarding all potential upcoming mergers, acquisitions, and financings in which the Investment Bank is advising, providing underwriting, or otherwise involved.  (*Id.* ¶¶ 21-25.)   For each such transaction, the Confidential Database may include, but is not limited to, the names of the entities involved in the potential or pending transaction, the firm's role in the transaction, the nature of the transaction, the securities involved, the type of financing involved, the size of the transaction, pricing information, and the projected public announcement date.  (*Id.* ¶ 24.)  In his role as compliance analyst, Sanchez routinely accessed the Confidential Database to update it with nonpublic information he had obtained from the Investment Bank's private-side advisory employees regarding potential or pending mergers and acquisitions, tender offers, SPAC transactions, and financing transactions involving the Investment Bank's clients.  (*Id.* ¶¶ 20, 25-26.)

The Confidential Database also contains the Investment Bank's "Grey List," a confidential list of entities about which the firm's advisory employees possess material, nonpublic information.  (*Id.* ¶¶ 22-24.)  Typically, an entity is listed on the Grey List if an Investment Bank employee becomes aware of nonpublic information regarding a potential or pending transaction involving that entity, such as a merger or acquisition (including tender offers and SPACs) or financing (including public and private securities offerings).  (*Id.* ¶¶ 22-23.) Sanchez's duties as compliance analyst required that he obtain information from the firm's

advisory employees regarding their knowledge of such nonpublic information and that he access, review, and update the Grey List with that information. (*Id.* ¶¶ 22-23, 25.) Adding an entity to the Grey List may trigger the Investment Bank to impose certain control measures related to that entity, including surveillance of employee and client trading activities in the entity's securities, and denial of requests by Investment Bank employees to trade in those securities. (*Id.* ¶ 23.) This process aids the Investment Bank's Compliance Division in preventing employees from trading on material, nonpublic information. (*Id.* ¶ 21.)

**B.    The Investment Bank's Policies Prohibited Sanchez From Executing Personal Securities Trades on the Basis of Confidential Information**

The Investment Bank's policies and procedures clearly and repeatedly told Sanchez that information about the firm's clients—such as the transaction information maintained in the Confidential Database—was confidential and that he was prohibited from using such information for his personal benefit. (*Id.* ¶¶ 12-19.) For example, Sanchez's employment contract at the Investment Bank, which he signed in July 2019, informed him that, in the course of his employment, he "may have access to non-public information and materials" and that he was required to maintain such information in "strict confidence" and use it "only for the purposes intended" by the Investment Bank. (*Id.* ¶ 12.) Additionally, the Investment Bank's "Firmwide Policy Regarding the Safeguarding of Confidential Information and Information Barriers" ("Confidential Information Policy") explicitly barred Sanchez from trading on information related to the Investment Bank's clients:

> Personnel who are aware of [material, nonpublic information] about an entity or its Financial Instruments [*e.g.*, securities, including stock, options, and warrants], regardless of their information barrier status and/or how they received such information . . . are restricted from executing, directing, soliciting, advising on, recommending or influencing any transaction in any applicable Financial Instrument of the entity . . . for their personal or related accounts . . . .

4

(*Id.* ⁋ 14.)

Sanchez also completed multiple trainings that reiterated the Investment Bank's expectations that he maintain the confidentiality of client information.  (*Id.* ⁋⁋ 17-19.)

This includes the Investment Bank's "Insider Trading Training," which Sanchez completed on April 2, 2020 and which emphasized that employees in the Compliance Division "receive both public and non-public information concerning the firm's various divisions.  It is never appropriate to use such information for your personal benefit (e.g., as a basis for a trade) or to share such information with third parties (e.g., tipping)."  (*Id.* ⁋ 18.)  This also includes the Investment Bank's "Annual Compliance Training," which Sanchez completed in both 2019 and 2020, and which also made clear that, with respect to the Investment Bank clients about which an employee has learned material, nonpublic information during the course of their work, such employees are "restricted from executing, directing, . . . recommending or influencing any transaction . . . ."   (*Id.* ⁋ 19.)

In addition to the obligations imposed by the Investment Bank related to material, nonpublic information, the Investment Bank's policy entitled "Personal Trading" ("Personal Trading Policy") required all employees to disclose to the Investment Bank any brokerage accounts as to which they had any control, interest, discretion, or influence.  (*Id.* ⁋ 15.)  The Investment Bank also required employees to pre-clear any securities transaction with the firm before trading, a process that included the employee certifying that "they are not aware of material non-public information regarding the Financial Instrument" for which they sought permission to trade.  (*Id.*)  Sanchez repeatedly affirmed—in 2019, 2020, and 2021—that he had reviewed and understood his obligations to maintain the confidentiality of nonpublic information

learned in the course of his employment, refrain from using that information for his own personal

benefit, disclose brokerage accounts, and pre-clear securities trades.  (*Id.* ¶ 16.)

## C.      Sanchez Violated the Investment Bank's Policies Regarding Brokerage Accounts and Personal Trading

Notwithstanding the Investment Bank's policies requiring Sanchez to disclose to the

Investment Bank all brokerage accounts with respect to which Sanchez had any control, interest,

discretion, or influence, Sanchez never disclosed the existence of, or his relationship to, any of

the four brokerage accounts he controlled.  (*Id.* ¶¶ 16, 36.)  Nor did Sanchez comply with the

Investment Bank's requirement that he seek and obtain pre-clearance to place any of his

securities trades, a process that would have required him to affirm that he did not have material,

nonpublic information regarding the securities at issue (*id.* ¶ 36)—something he could not do.  In

fact, had Sanchez requested permission to trade in the securities of the Investment Bank clients

involved in the Investment Bank Deals, he would have been barred from doing so or his insider

trading scheme would likely have been discovered.

## D.      Sanchez Traded Based On Material, Nonpublic Information

Between September 2020 and May 2021, Sanchez used material, nonpublic information

from the Confidential Database to profitably trade in the securities of 45 public issuers in

advance of 45 material transactions announced by those entities, including mergers and

acquisitions, tender offers, SPAC deals, and equity financings ("Investment Bank Deals").  (*Id.*

¶¶ 11, 26, 32.)  In each case, the Investment Bank was advising one of the parties to the

transaction and the Confidential Database contained material, nonpublic information concerning,

among other things, the entities involved, the nature of the transaction, and the date on which the

transaction would be publicly announced.  (*Id.* ¶¶ 24, 26, 32, 40, 56, 66, 83 & Exh. 4.)  Access

logs from the Confidential Database show that, before effecting each of these trades, Sanchez

accessed the Confidential Database information regarding the respective Investment Bank Deal and entities involved.  (*Id.* ¶ 26.)  As detailed below, Sanchez then effected his trades—using a variety of trade types, including stock purchases, call options, put options, and warrants—in four accounts nominally held by the Relief Defendants (Gonzalez and Abellan, Sanchez's mother and father), but which Sanchez controlled.  (*Id.* ¶ 35.)

  1. <u>Sanchez's Trading in the Gonzalez Interactive Brokers Account</u>

Sanchez's insider trading scheme began in a brokerage account at Interactive Brokers LLC ("Interactive Brokers") nominally held by Sanchez's mother ("Gonzalez Interactive Brokers Account").  On August 16, 2020, Interactive Brokers received an application to open the Gonzalez Interactive Brokers Account, and Sanchez facilitated the account opening process by responding to an Interactive Brokers email and providing certain documentation necessary to open the account.  (*Id.* ¶ 37.)  Sanchez controlled the Gonzalez Interactive Brokers Account.  (*See id.* ¶¶ 8, 28-31, 37-40.)  Sanchez kept an Interactive Brokers application on his mobile telephone, allowing him to access the Interactive Brokers trading platform, despite that he had no Interactive Brokers account in his own name.  (*Id.* ¶ 29.)  Moreover, internet protocol records show that Sanchez repeatedly accessed the Gonzalez Interactive Brokers Account, including to conduct trading at issue here.  (*Id.* ¶ 31.)

In the Gonzalez Interactive Brokers Account, between September 9, 2020 and November 20, 2020, Sanchez traded based on material, nonpublic information in the securities of 12 entities in advance of 12 Investment Bank Deals involving those entities.  (*See id.* ¶ 40 & Exh. 4 (rows 1 to 12).)  In each case, before he traded, Sanchez accessed material, nonpublic information about the Investment Bank Deal in the Confidential Database.  (*Id.* ¶ 26.)  For example, on September 23, 2020, at 9:40 a.m. ET, Sanchez accessed the Confidential Database to access or input nonpublic information regarding Covis Group S.à.r.l.'s ("Covis Group") proposed tender offer to

acquire one of the Investment Bank's clients, AMAG Pharmaceuticals, Inc. ("AMAG").  (*Id.* ¶ 41.)  Later that same day, beginning at 3:37 p.m. ET, and continuing through September 30, 2020, Sanchez repeatedly accessed the Gonzalez Interactive Brokers Account to trade in AMAG securities, purchasing 100 AMAG call options and selling 20 AMAG put options (also referred to as "writing" put options)[1]—all of which were bets that AMAG's stock price would increase in the near future.[2]  (*Id.* ¶¶ 42, 44-45.)  By the time of Sanchez's first AMAG share purchase on September 23, Covis Group and AMAG had already taken substantial steps to complete the tender offer.  (*Id.* ¶ 43 (detailing those efforts).)  When Sanchez made his AMAG trades, AMAG's shares were trading between approximately $8.62 and $9.39 per share.  (*Id.* ¶ 45.)  On October 1, 2020, Covis Group publicly announced that it was commencing a tender offer for all of AMAG's outstanding shares at $13.75 per share.  (*Id.* ¶ 46.)  On this announcement, AMAG's share price increased by more than 45%, from $9.40 per share to $13.65 per share.  (*Id.* ¶ 46 & Exh. 4 (Row 7).)  In the two days after the announcement, Sanchez sold his 100 AMAG call

---

[1] In a put option contract, the seller (writer) of the put option conveys to the buyer the right to sell a certain number of shares of the underlying stock (usually, 100 shares) at a certain price on or before the expiration date.  In exchange for this right, the buyer pays the seller a premium for each put option contract.  The put option seller (writer) generally believes that the price of the underlying stock will increase, in which case the buyer's right to sell the shares will expire worthless, and the seller will profit by the amount of the premium paid.

[2] Specifically, Sanchez purchased 80 call options with a $10 strike price expiring October 16, 2020 and 20 call options with an $11 strike price also expiring October 16, 2020.  Rymas Decl. ¶ 44.  At the time of purchase, all of these options were "out of the money"—*i.e.*, they would expire worthless unless AMAG's share price increased above the strike price.  Sanchez also sold five put options with an $11 strike price expiring October 16, 2020, five put options with an $11 strike price expiring November 20, 2020, and 10 put options with a $10 strike price expiring November 20, 2020.  *Id.* ¶ 45.  These put options sold by Sanchez ultimately expired worthless to the buyer—allowing Sanchez to keep the full premium he received for writing them.  *Id.* ¶ 48.

options and, together with the premiums he had received from writing the AMAG put options, Sanchez obtained illegal trading profits of over $36,600.[3]  (*Id.* ¶ 47.)

In total, by trading on material, nonpublic information in the Gonzalez Interactive Brokers Account in front of 12 Investment Bank Deals, Sanchez obtained approximately $108,904 in illicit profits. (*Id.* ¶ 40.)  Subsequently, on November 20, 2020, Interactive Brokers advised that it was terminating the customer relationship associated with the Gonzalez Interactive Brokers Account and that assets in the account must be liquidated and transferred. (*Id.* ¶ 52.)  By December 16, 2020, approximately €140,600 was transferred out of the Gonzalez Interactive Brokers Account to banks in Spain.  (*Id.* ¶ 53.)

2.    Sanchez's Trading in the Abellan Schwab Account

On December 21, 2020—five days after Interactive Brokers closed the Gonzalez Interactive Brokers Account—Sanchez applied to open a brokerage account at Charles Schwab & Co. ("Schwab") in his father's name (the "Abellan Schwab Account").  (*Id.* ¶ 54.)  That day, the Abellan Schwab Account was opened and, notwithstanding that it was nominally held in his father's name, Sanchez controlled the account.  (*Id.* ¶¶ 9, 28-31, 55.)  As with Interactive Brokers, Sanchez kept a Schwab trading application on his mobile phone, despite that he had no Schwab account in his own name.  (*Id.* ¶ 29.)  And, as with Interactive Brokers, internet protocol records show that Sanchez repeatedly accessed the Abellan Schwab Account, including to conduct trading at issue here.  (*Id.* ¶¶ 30-31, 54.)

In the Abellan Schwab Account, between January 11, 2021 and May 26, 2021, Sanchez traded based on material, nonpublic information in the securities of 20 entities in advance of 20

---

[3] Sanchez also sold (wrote) put options in the Gonzalez Interactive Brokers Account in advance of another Investment Bank Deal involving an Investment Bank client and based on information from the Confidential Database.  *See* Rymas Decl. ¶ 49 & Exh. 4 (row 10).

Investment Bank Deals involving those entities.  (*Id.* ¶ 61 & Exh. 4 (rows 13 to 15, 19-20, 23,

25-28, 31-32, 34, 36-37, 39, 41, 43-45).)  In each case, before trading, Sanchez accessed

material, nonpublic information about the Investment Bank Deal in the Confidential Database.

(*Id.* ¶ 26.)  For example, between December 4 and December 18, 2020, Sanchez repeatedly

accessed the Confidential Database to access or input nonpublic information regarding Horizon

Therapeutics plc's ("Horizon Therapeutics") proposed tender offer to acquire the Investment

Bank's client, Viela Bio, Inc. ("VIE").  (*Id.* ¶ 57.)  On January 13, 2021, Sanchez accessed the

Abellan Schwab Account and purchased 200 VIE shares at $36.25 per share and, on January 22,

2021, Sanchez again accessed that account and purchased an additional 200 VIE shares at $34.40

per share.  (*Id.* ¶ 58.)  By the time of Sanchez's first VIE share purchase on January 13, Horizon

Therapeutics and VIE had already taken substantial steps to complete the tender offer.  (*Id.* ¶ 59

(detailing those efforts).)  On February 1, 2021, Horizon Therapeutics publicly announced that it

was commencing a tender offer for all of VIE's outstanding shares at $53.00 per share.  (*Id.* ¶ 57

& Exh. 13.)  On this announcement, VIE's share price increased by more than 52%, from $34.68

per share to $52.81 per share.  (*Id.* ¶ 60.)  After the announcement on February 1, Sanchez sold

all 400 shares in the Abellan Schwab Account, obtaining illegal trading profits of approximately

$7,009.  (*Id.*)

　　　In total, by trading on material, nonpublic information in the Abellan Schwab Account in

front of 20 Investment Bank Deals, Sanchez obtained illicit trading profits of approximately

$78,197.  (*Id.* ¶ 61.)  As of September 23, 2021, the Abellan Schwab Account is open and holds

approximately $68,565 in cash and securities.  (*Id.* ¶ 88.)

　　　3.　　Sanchez's Trading in the Gonzalez Tastyworks Account

　　　On December 26, 2020—five days after applying to open the Abellan Schwab Account—

Sanchez also applied to open a brokerage account at Tastyworks, Inc. ("Tastyworks") to be

nominally held in his mother's name ("Gonzalez Tastyworks Account").  (*Id.* ¶ 62.)  When Tastyworks requested that the applicant verify the email address associated with the application for the Gonzalez Tastyworks Account, Sanchez completed the verification from his mobile telephone.  (*Id.* ¶¶ 63-65.)  After the account was opened, Sanchez controlled it.  (*Id.* ¶¶ 8, 28-31.)  Sanchez had direct access to the email address associated with the Gonzalez Tastyworks Account.  (*Id.* ¶ 63.)  As with Interactive Brokers and Schwab, Sanchez kept a Tastyworks trading application on his mobile phone, despite that he had no Tastyworks account in his own name.  (*Id.* ¶ 29.)  Also like Interactive Brokers and Schwab, internet protocol records show that Sanchez repeatedly accessed the Gonzalez Tastyworks Account, including to conduct trading at issue here.  (*Id.* ¶¶ 30-31.)

In the Gonzalez Tastyworks Account, between January 13, 2021 and May 21, 2021, Sanchez traded based on material, nonpublic information in the securities of 13 entities in advance of 13 Investment Bank Deals involving those entities.  (*See id.* ¶¶ 66, 75 & Exh. 4 (rows 16-18, 21-22, 24, 29, 30, 33, 35, 38, 40, 42).)  In each case, before he traded, Sanchez accessed material, nonpublic information about the Investment Bank Deal in the Confidential Database.  (*Id.* ¶ 26.)  For example, between December 4, 2020 and February 1, 2021, Sanchez repeatedly accessed the Confidential Database to access or input nonpublic information regarding Jazz Pharmaceuticals plc's ("Jazz Pharmaceuticals") proposed acquisition of an Investment Bank client, G.W. Pharmaceuticals plc ("GWPH").  (*Id.* ¶ 67.)  This includes Sanchez accessing the Confidential Database regarding the Jazz Pharmaceuticals-GWPH merger on February 1, 2021 at 6:04 a.m. ET.  (*Id.*)  That same day, at 2:11 p.m. ET, Sanchez bought 15 GWPH call options, with a $165 strike price and an expiration date of February 19, 2021.  (*Id.* ¶ 68.)  When Sanchez purchased the GWPH call options, they were "out of the money," and Sanchez was betting that

the share price would increase substantially in the near future.  Two days later, on February 3, 2021, Jazz Pharmaceuticals announced that it would acquire, and merge with, GWPH for $220 per share (in the form of $200 per share in cash, and $20 in Jazz shares).  (*Id.* ¶ 69.)  On this announcement, GWPH's share price increased by more than 44%, from $146.25 per share to $211.37 per share.  (*Id.* ¶ 70 & Exh. 4 (Row 21).)  On February 3, 2021, following the announcement, Sanchez sold all 15 GWPH call options, obtaining illegal trading profits of approximately $70,484.  (*Id.* ¶ 70.)

In the Gonzalez Tastyworks Account (and in the other accounts he controlled), Sanchez also traded in advance of several securities offerings in which the Investment Bank was the underwriter.  (*See id.* ¶ 71 & Exh. 4 (rows 2-6, 9, 13, 15, 17, 25-26, 30, 32-33, 35, 37, 41, 42-45).)  In these trades, Sanchez anticipated that an entity's share price would decrease upon its announcement of the offering due to the dilutive effect on existing shareholders.  (*Id.* ¶ 73.)  For example, on March 4, 2021 at 4:31 a.m. ET, Sanchez accessed the Confidential Database to input and access information regarding Norwegian Cruise Line Holdings Ltd.'s ("NCLH") upcoming equity offering.  (*Id.* ¶ 71.)  That same day, at 10:13 a.m. ET, Sanchez accessed the Gonzalez Tastyworks Account and began buying NCLH put options, purchasing 110 put options over the course of the day.  (*Id.* ¶ 72.)  The next day, March 5, NCLH announced its equity offering and NCLH's share price decreased by more than 12%, from $32.90 per share to $28.85 per share.  (*Id.* ¶ 73.)  Following the announcement, Sanchez sold all of his NCLH put options, obtaining illegal profits of approximately $15,464.  (*Id.* ¶ 74.)

In total, by trading on material, nonpublic information in the Gonzalez Tastyworks Account in front of 13 Investment Bank Deals, Sanchez obtained illicit trading profits of

approximately $207,993.  (*Id.* ⁋ 75.)  As of September 23, 2021, the Gonzalez Tastyworks

Account remains open and holds approximately $261,337 in cash and securities.  (*Id.* ⁋ 89.)

       4.    <u>Sanchez's Trading in the Abellan Interactive Brokers Account</u>

     On March 18, 2021, Interactive Brokers received an application to open, and approved

the opening of, an account nominally held in Sanchez's father's name ("Abellan Interactive

Brokers Account").  (*Id.* ⁋ 76.)  Sanchez also controlled the Abellan Interactive Brokers Account.

(*Id.* ⁋⁋ 9, 28-31.)  As noted above, Sanchez kept an Interactive Brokers application on his mobile

phone, despite that he had no Interactive Brokers account in his own name.  (*Id.* ⁋ 29.)

Moreover, internet protocol records show that Sanchez repeatedly accessed the Abellan

Interactive Brokers Account, including to conduct trading at issue here.  (*Id.* ⁋⁋ 30-31.)

     In the Abellan Interactive Brokers Account, between March 24, 2021 and May 26, 2021,

Sanchez traded based on material, nonpublic information in the securities of 10 entities in

advance of 10 Investment Bank Deals involving those entities.  (*See id.* ⁋ 77 & Exh. 4 (rows 36-

45).)  In each case, before he traded, Sanchez accessed material, nonpublic information about the

Investment Bank Deal in the Confidential Database.  (*Id.* ⁋ 26.)

     In addition to tender offers and securities offerings, such as those described above,

Sanchez's scheme included trading in advance of numerous mergers and acquisitions involving

SPACs, including in the Abellan Interactive Brokers Account.  (*See id.* ⁋ 78 & Exh. 4 (rows 16,

18, 22-23, 28-29, 34, 39, 41).)  For example, on April 9, 2021 at 2:35 p.m. ET, Sanchez accessed

the Confidential Database to access or input nonpublic information regarding the proposed

acquisition of an Investment Bank client, Roviant Sciences Ltd. ("Roviant"), by a SPAC, Montes

Archimedes Acquisition Corp. ("MAAC").  (*Id.* ⁋ 79.)  Later that day, Sanchez began buying

MAAC stock in the Abellan Interactive Brokers Account, and between April 9 and April 28,

2021 (during which time he continued to access the Confidential Database regarding the MAAC-

Roviant deal), Sanchez purchased a total of 1,000 MAAC shares.  (*Id.* ¶¶ 79-80.)  On April 28, 2021, Sanchez also purchased 2,000 MAAC warrants.  (*Id.* ¶ 81.)  On May 3, 2021, MAAC announced its transaction with Roviant, and the price for its shares increased from $9.86 per share to $9.95 per share.  (*Id.* ¶ 82.)  That day, after the announcement, Sanchez sold all of the MAAC shares and warrants in the Abellan Interactive Brokers Account, and obtained illegal profits of approximately $1,093.  (*Id.*)

In total, by trading on material, nonpublic information in the Abellan Interactive Brokers Account in front of 10 Investment Bank Deals, Sanchez obtained illicit trading profits of approximately $76,630.  (*Id.* ¶ 83.)

     5.     The Investment Bank Interviewed Sanchez and
             He Withdrew Illegal Profits From the Abellan Interactive Brokers Account

On May 26, 2021, the Investment Bank interviewed Sanchez regarding certain suspicious activity and the next day, May 27, he resigned.  (*Id.* ¶¶ 85-86.)  On May 28, Interactive Brokers received a request to liquidate and withdraw assets from the Abellan Interactive Brokers Account, and, over the next six weeks, approximately €50,300 was transferred from the Abellan Interactive Brokers Account to a bank account in Spain.  (*Id.* ¶ 87.)  No assets remain in the Abellan Interactive Brokers Account.[4]  (*Id.*)

As noted above, the Abellan Schwab Account remains open and holds approximately $68,565 in cash and securities, the Gonzalez Tastyworks Account remains open and holds approximately $261,337 in cash and securities, and the Sanchez Digital Asset Account remains open and holds approximately $27,829 in cash and digital assets.

---

[4] In addition to the four brokerage accounts described above, Sanchez has a digital asset account in his name at a U.S.-based digital asset exchange ("Sanchez Digital Asset Account").  (Rymas Decl. ¶¶ 30, 90.)  Sanchez's digital asset account currently holds approximately $27,829 in Euros, Ripple, and Ethereum.  (*Id.* ¶ 90.)

## ARGUMENT

### I. THE COURT SHOULD FREEZE SANCHEZ'S ASSETS

#### A. The SEC's Burden in Seeking an Asset Freeze Is Not Onerous

It is well-settled that the Commission may seek and the Court may impose an asset freeze, including to preserve funds for potential monetary remedies. *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1102-1106 (2d Cir. 1972). As the Second Circuit emphasized in *SEC v. Unifund SAL*, "the Commission should be able to preserve its opportunity to collect funds that may yet be ordered disgorged." 910 F.2d 1028, 1041 (2d Cir. 1990). An asset freeze achieves that end by ensuring that "any funds that may become due can be collected," *id.* at 1041, and "preserv[ing] the status quo by preventing the dissipation and diversion of assets," *SEC v. Infinity Group*, 212 F.3d 180, 197 (3d Cir. 2000). Because the Commission appears "not as an ordinary litigant, but as a statutory guardian charged with safeguarding the public interest in enforcing the securities laws," the Commission's burden of proof in seeking injunctive relief is substantially lower than that of a private litigant seeking a temporary restraining order or preliminary injunction. *SEC v. Mgmt. Dynamics*, 515 F.2d 801, 808 (2d Cir. 1975); *see also Unifund SAL*, 910 F.2d at 1037. The Commission's burden is even lower when the injunctive relief it seeks is a temporary asset freeze. *SEC v. Byers*, No. 08-CV-7104 (DC), 2009 WL 33434, at *2 (S.D.N.Y. Jan. 7, 2009). The Commission need only show either a likelihood of success on the merits, or that an inference can be drawn that the defendant has violated the federal securities laws. *Smith v. SEC*, 653 F.3d 121, 128 (2d Cir. 2011). A freeze is particularly warranted where," as here, the defendant's alleged conduct involves fraud." *SEC v. Credit Bancorp Ltd.*, No. 99-CV-11395, 2010 WL 768944, at *3 (S.D.N.Y. Mar. 8, 2010).

Upon making the required showing, the Commission is entitled to a freeze of assets "sufficient to preserve its disgorgement remedy as well as assets necessary to pay civil monetary

penalties." *SEC v. Maillard*, No. 13-CV-5299 (VEC), 2014 WL 1660024, at \*4 (S.D.N.Y. April 23, 2014).  Because Congress has authorized a civil penalty equal to three times the profits of insider trading, it is appropriate for the Court to freeze funds sufficient to pay both the disgorgement of the ill-gotten gains and a three-time penalty amount that may eventually be due. *See id.*; *see also SEC v. Compania Internacional Financiera S.A.*, No. 11-CV-4904 (DLC), 2011 WL 3251813, at \*12 (S.D.N.Y. July 29, 2011); *SEC v. Dubovoy*, No. 15-CV-6076, 2015 WL 6122261, at \*9 (D.N.J. Oct. 16, 2015) ("[T]he fact that [the defendant] who controls the foreign entities, lives abroad raises a serious concern that he may transfer corporate funds beyond the Court's jurisdiction and dissipate the assets available for any eventual award.").

Here, the Commission is likely to succeed on the merits of its insider trading claims against Sanchez under Section 17(a) of the Securities Act of 1933 ("Securities Act"), Sections 10(b) and 14(e) of the Securities Exchange Act of 1934 ("Exchange Act"), and Exchange Act Rules 10b-5 and 14e-3.  At minimum, the Court may draw an inference that Sanchez illegally traded on insider information given that, among other things, (1) Sanchez's profitable trades were in securities of Investment Bank clients or counterparties to those clients; (2) Sanchez had access to material, nonpublic information regarding those entities, and anticipated Investment Bank Deals in which they were involved, via the Investment Bank's Confidential Database; (3) in each instance, before trading, Sanchez accessed material, nonpublic information in the Investment Bank's Confidential Database concerning an Investment Bank Deal involving the company in whose securities Sanchez then traded; and (4) Sanchez concealed his trading by effecting it in brokerage accounts that were not in his name, but which he controlled, and by failing to pre-clear his securities trades.  An asset freeze is appropriate, particularly to prevent

Sanchez (or the Relief Defendants) from moving funds to a foreign bank account or otherwise dissipating assets to avoid having to satisfy an eventual monetary judgment.

> **B.      The Commission Is Likely to Succeed in Proving That Sanchez Violated Section 17(a) of the Securities Act, <u>Section 10(b) of the Exchange Act, and Exchange Act Rule 10b-5</u>**

Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Exchange Act Rule 10b-5 prohibit insider trading.  *SEC v. Obus*, 693 F.3d 276, 284 (2d Cir. 2012); *SEC v. Lyon*, 529 F. Supp. 2d 444, 453 (S.D.N.Y. 2008).  The Supreme Court has recognized two legal theories of insider trading:  the classical theory and the misappropriation theory.  *Obus*, 693 F.3d at 284-85 (citing cases).  The classical theory applies to a corporate insider who trades based on material, nonpublic information about the company "in violation of the duty of trust and confidence insiders owe to shareholders."  *Id.* at 284 (citing *Chiarella v. United States*, 445 U.S. 222, 228 (1980).)  The misappropriation theory holds that a person commits fraud in violation of Section 10(b) of the Exchange Act and Rule 10b-5 when that person misappropriates material, nonpublic information for securities trading in breach of a duty owed to the source of the information.  *Id.*  Thus, under either theory, a person violates Section 10(b) and Rule 10b-5,

> when he obtains (a) material, (b) nonpublic information intended to be used solely for a proper purpose and then (c) misappropriates or otherwise misuses that information (d) with scienter, (e) in breach of a fiduciary duty, or other duty arising out of a relationship of trust and confidence, to make "secret profits."

*SEC v. Gonzalez de Castilla*, 145 F. Supp. 2d 402, 412 (S.D.N.Y. 2001) (citing *Dirks v. SEC*, 463 U.S. 646, 654 (1983) and *United States v. Newman*, 664 F.2d 12 (2d Cir. 1981)).  The Second Circuit has explained that "[e]ssentially the same elements are required under Section 17(a)(1)-(3) [of the Securities Act] in connection with the offer or sale of a security, though no showing of scienter is required for the SEC to obtain an injunction under subsections (a)(2) or (a)(3)."  *SEC v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999).

The Commission is likely to succeed in proving that Sanchez met each of these elements under either the classical or the misappropriation theory, or that, at a minimum, an inference can be drawn that he violated Securities Act Section 17(a), Exchange Act Section 10(b), and Rule 10b-5 thereunder.

### 1.   *The Information Sanchez Possessed Was Both Material and Nonpublic*

The information that Sanchez accessed in the Confidential Database concerning 45 significant corporate events involving Investment Bank clients was highly material and nonpublic.  "The Second Circuit has repeatedly held that specific information pertaining to a proposed corporate acquisition, tender offer, or merger is quintessentially material." *Gonzalez de Castilla*, 145 F. Supp. 2d at 412 (citing cases); *see also SEC v. Materia*, 745 F.2d 197, 199 (2d Cir. 1984) ("Because even a hint of an upcoming tender offer may send the price of the target company's stock soaring, information regarding the identity of a target is extremely sensitive and zealously guarded."); *SEC v. Sekhri*, 98-CV-2320 (RPP), 2002 WL 31100823, at *13 (S.D.N.Y. July 22, 2002) ("Few matters are more material than a corporation's involvement in a possible merger or acquisition.").  A securities offering is similarly material.  *See Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 495 F.2d 228, 237 (2d Cir. 1974) (investment banker had access to material information when working on a proposed public offering for the corporation).  Among other things, "instructions to investment bankers, and actual negotiations between principals or their intermediaries" can indicate that discussions regarding a transaction are sufficiently serious that they become material to a reasonable investor.  *Basic v. Levinson*, 485 U.S. 224, 239 (1998).  "Moreover, where information regarding a merger originates from an insider, the information, even if not detailed, 'takes on an added charge just because it is inside information.'"  *SEC v. Mayhew*, 121 F.3d 44, 52 (2d Cir. 1997) (quoting *SEC v. Geon Indus.*, 531 F.2d 39, 47 (2d Cir. 1976)).  Evidence demonstrating the materiality of a transaction can also

18

include a "substantial increase in the stock price upon [its] public announcement." *Sekhri*, 2002 WL 31100823, at *13.

Information is nonpublic until it "achieve[s] a broad dissemination to the investing public generally and without favoring any special person or group." *Mayhew*, 121 F.3d at 50 (quoting *Dirks*, 463 U.S. at 653 n.12 (1983)). And, "information may be nonpublic within the meaning of the [Exchange] Act even though it does not reveal all the details" of a transaction. *Id.* (citation omitted).

In this case, Sanchez accessed, and then traded securities on the basis of material information regarding publicly-traded entities likely to be involved in upcoming Investment Bank Deals—including, 20 forthcoming mergers or acquisitions (including 3 tender offers and 9 SPAC deals), and 24 significant equity offerings. (Rymas Decl. ¶¶ 11, 35, 78 & Exh. 4.) With respect to each Investment Bank Deal, Sanchez had access, via the Confidential Database, to the names of the entities involved in the potential transaction, the nature of the transaction (including the transaction size and pricing), the securities involved, and projected public announcement date. (*Id.* ¶ 24.) This is precisely the type of information that Courts have deemed as material and nonpublic. *See, e.g.*, *Obus*, 693 F.3d at 289 n.3 ("Unannounced acquisitions are a prototypical example of material non-public information."). Moreover, following all but 6 of the relevant public announcements, stock prices moved from between 2.24% and 100.09%. (Rymas Decl. Exh. 4.) These changes in stock prices following the public announcements further underscore that the information on which Sanchez traded was material. *See SEC v. Warde*, 151 F.3d 42, 47 (2d Cir. 1998) (holding that materiality was "confirmed by the fact that the stock price jumped when [the] information was made public"); *Sekhri*, 2002 WL 31100823, at *13.

Additionally, the information that Sanchez accessed in the Confidential Database regarding the Investment Bank Deals was nonpublic when Sanchez traded on it.  *See Sekhri*, 2002 WL 31100823, at *14 (finding that "information concerning the mergers and acquisition" was nonpublic because "there were no indications that the [information] was known by the investing public" prior to the public announcements of the deals).  To the contrary, the Investment Bank had taken steps to prevent that information's public disclosure, including requiring adherence to confidentiality and trading policies and restricting access to the Confidential Database.  *See SEC v. Suman*, 684 F. Supp. 2d 378, 388 (S.D.N.Y. 2010) (finding information to be nonpublic where source "took extraordinary measures to keep the potential acquisition confidential, from requiring employees to sign confidentiality agreements to assigning a codename to the merger").  Accordingly, in addition to being material, the information on which Sanchez traded was nonpublic.

> ### 2.     *Sanchez Misappropriated or Misused the Information by Trading on It*

Sanchez misappropriated or misused material, nonpublic information that he accessed when working at the Investment Bank.  A defendant misappropriates or misuses material, nonpublic information when he secretly trades while in possession of such information.  *SEC v. Lyon*, 605 F. Supp. 2d 531, 547 (S.D.N.Y. 2009); *see also* 17 C.F.R. § 240.10b5-1 ("[A] purchase or sale of a security of an issuer is 'on the basis of' material, nonpublic information about that security or issuer if the person making the purchase or sale was aware of the material, nonpublic information when the person made the purchase or sale.").

During the time he worked at the Investment Bank, Sanchez traded in the stocks of at least 45 companies involved in significant corporate events advised by the Investment Bank.  Sanchez's trading followed a pattern.  First, according to access logs from the Confidential Database, Sanchez would specifically (and, often repeatedly) access the portion of the

Confidential Database that maintained highly sensitive, material, and nonpublic information about an upcoming Investment Bank Deal and the entities involved.  Sanchez would then log into one of four brokerage accounts that he controlled, but that were nominally held in his parents' names, and would place trades in the securities of one of the entities for which he had accessed confidential information, knowing that a transaction involving the entity was forthcoming.  Sanchez frequently timed his trading to be within days of the relevant announcement.  Sanchez also concealed his trading by effecting it in accounts that were in names other than his own and which he had not disclosed to the Investment Bank, and also by failing to seek pre-clearance of the trades with the Investment Bank.  After the relevant entity publicly announced the Investment Bank Deal, Sanchez would sell his entire securities position and obtain illegal profits.

Sanchez followed this pattern with respect to each of the 45 Investment Bank Deals, trading only after he had accessed material, nonpublic information in the Confidential Database. This pattern of trading supports the conclusion that Sanchez traded based on material, nonpublic information he obtained from the Confidential Database.  Courts routinely find an inference of insider trading when unusual and suspicious trading is present.  *See, e.g.*, *United States v. Larrabee*, 240 F.3d 18, 21 (1st Cir. 2001) (finding that "circumstantial evidence of a well-timed and well-orchestrated sequence of events, culminating with successful stock trades, creates a compelling inference of possession [of inside information] by the tipper."); *Warde*, 151 F.3d at 47-48 (finding that defendant's access to insider information, considered with a pattern of phone calls and stock purchases, provided sufficient evidence of insider trading).  Sanchez's distinct pattern of well-timed round-trip trades in securities for which he had material non-public information demonstrates his insider trading.  *See SEC v. One or More Unknown Traders in Sec.*

21

*of the Onyx Pharm., Inc.*, No. 13-CV-4645 (JPO), 2014 WL 5026153, at *7 (S.D.N.Y. Sept. 29, 2014) (finding inference of insider trading where trader had no prior history purchasing the securities at issue, yet made "remarkably well-timed and highly profitable" trades just before public announcement causing "stock to jump in value").

### 3. *Sanchez Breached Duties of Trust and Confidence That He Owed to the Investment Bank and Its Clients*

Sanchez breached his fiduciary duty, or a similar duty of trust and confidence, under both the classical and misappropriation theories of insider trading. First, the classical theory "involve[s] breaches, whether direct or derivative, of duties to shareholders of the insider's company." *United States v. Whitman*, 904 F. Supp. 2d 363, 366 (S.D.N.Y. 2012) (citing *Obus*, 693 F.3d at 284). Under the classical theory, insider trading liability does not end with a company's own employees. Rather, it extends to outsiders (like the company's financial advisors), who owe a fiduciary duty to the company's shareholders because the outsiders "have entered into a special confidential relationship in the conduct of the business of the enterprise and are given access to information solely for corporate purposes." *Dirks*, 463 U.S. at 655 n.14. Courts have extended such "temporary insider" status to financial advisors like the Investment Bank. *See SEC v. Cuban*, 620 F.3d 551, 554 (5th Cir. 2010) ("[U]nderwriters, accountants, lawyers, or consultants are all considered corporate insiders when by virtue of their professional relationship with the corporation they are given access to confidential information.") (citing *Dirks*, 463 U.S. at 655 n.14); *see also Gonzalez de Castilla*, 145 F. Supp. 2d at 413 ("As a general matter, insider trading cases hold that a duty arises in cases where the person is . . . a 'temporary insider . . . .'") (collecting cases); *SEC v. Downe*, 92-CV-4092 (PKL), 1993 WL 22126, at *6 (S.D.N.Y. Jan. 26, 1993); *see also United States v. Chestman*, 947 F.2d 551, 566 (2d Cir. 1991). The Investment Bank's clients granted it and its employees "access to

information solely for corporate purposes." *Dirks*, 463 U.S. at 655 n.14.  Thus, the Investment

Bank, and its employees entrusted with the confidential corporate information, including

Sanchez, are temporary insiders of each of the Investment Bank's clients.

The misappropriation theory "targets persons who are not corporate insiders but to whom

material non-public information has been entrusted in confidence and who breach a fiduciary

duty to the source of the information to gain personal profit in the securities market." *Obus*, 693

F.3d at 284.  The paradigmatic misappropriation case involves an employee who—when

entrusted by his employer with confidential information—owes a duty of loyalty and

confidentiality to his employer.  *See, e.g.*, *United States v. O'Hagan*, 521 U.S. 642, 654-656, 659

(1997) (holding that a law firm employee could be held criminally liable for insider trading on

misappropriation theory where he breached a duty of loyalty and confidentiality to his law firm

employer).  Under the misappropriation theory, "the defendant['s] undisclosed embezzlement or

'misappropriation' of market-sensitive confidential information from [his] employer[]" for

insider trading defrauds the employer.  *Whitman*, 904 F. Supp. 2d at 367.

Under either theory, Sanchez breached a fiduciary or similar duty for personal benefit.

The Investment Bank entrusted Sanchez with access to confidential information about its

corporate clients and Investment Bank Deals involving those clients.  In fact, Sanchez's very job

was to monitor and track this highly sensitive information in order to prevent its misuse,

including unlawful securities trading.  This information included the Investment Bank's

collective knowledge of its clients and client counterparties likely to be involved in upcoming

Investment Bank Deals, the details of those Investment Bank Deals (*e.g.*, the nature and size of

the transaction, and the dollar amount to be paid), and the date on which the Investment Bank

Deals would be announced.  In 2019, 2020, and 2021, Sanchez signed certifications and

undertook trainings which required him to maintain the Investment Bank's client confidences and binding him to firm policies that prohibited him from trading on material, nonpublic information learned in the course of his role as compliance analyst (indeed, prohibiting him from trading at all without having each trade pre-cleared by the Investment Bank and, even then, only in brokerage accounts that had been disclosed to the Investment Bank).  Nonetheless, Sanchez traded on confidential Investment Bank Deal information for substantial profits of approximately $471,700.

Thus, under the classical theory, Sanchez breached his duty to the shareholders of the Investment Bank's clients when he traded in the securities of those companies.  While under a misappropriation theory, Sanchez breached his duty to the Investment Bank when he traded in the securities of all 45 relevant companies.

### 4.    *Sanchez Acted With Scienter*

Sanchez also acted with the requisite scienter—*i.e.*, a "mental state embracing intent to deceive, manipulate, or defraud," *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976). One who trades in securities possessing information that he knows or has reason to know is confidential and was improperly obtained, or who trades in reckless disregard of these facts, acts with scienter.  *See, e.g.*, *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 44-46 (2d Cir. 1978). The law does not require direct evidence of scienter.  Rather, in securities fraud cases like this one, "circumstantial evidence can be more than sufficient" to prove scienter, particularly given "the difficulty of proving the defendant's state of mind."  *Herman & MacLean v. Huddleston*, 459 U.S. 375, 391 n.30 (1983).  This is especially true in insider trading cases:  "Proof of insider trading can well be made through an inference from circumstantial evidence and not solely upon a direct testimonial confession."  *SEC v. Singer*, 786 F. Supp. 1158, 1164 (S.D.N.Y. 1992).

"In every insider trading case, at the moment of tipping or trading, just as in securities fraud cases across the board, the unlawful actor must know or be reckless in not knowing that conduct was deceptive." *Obus*, 693 F.3d at 286.  To be held liable, the insider must first trade the securities "deliberately or recklessly, not through negligence." *Id*.  Second, he "must know that the information that is the subject of the [trade] is non-public and is material for securities trading purposes or act with reckless disregard of the nature of the information." *Id*.  Finally, he "must know (or be reckless in not knowing) that to disseminate the information would violate a fiduciary duty.  While [he] need not have specific knowledge of the legal nature of a breach of fiduciary duty, he must understand that tipping [or trading on the basis of] the information would be violating a confidence." *Id*.

Substantial evidence here demonstrates that Sanchez traded on nonpublic information from the Confidential Database with scienter.  *First*, his trades were deliberate; he did not accidentally make them.  *Second*, Sanchez knew (or was reckless in not knowing) that Confidential Database information concerning pending Investment Bank deals was material and nonpublic.  The Investment Bank provided Sanchez with multiple policies and trainings—each of which he attested that he received and understood—informing him that information about the Investment Bank's clients must be held in strict confidence and could not be used for his personal benefit.  *Third*, Sanchez knew (or was reckless in not knowing) that his trading on information about the Investment Bank Deals violated a confidence because the Investment Bank repeatedly told him that he could not disclose or profit from any information learned at the firm. The fact that Sanchez hid his trading from the Investment Bank by using accounts that were not in his own name, but which he controlled, and by failing to pre-clear the trades with the Investment Bank—all in violation of the Investment Bank's trading policies—further

25

underscores that he knew (or was reckless in not knowing) that his trading violated a confidence. Finally, and perhaps most notably, Sanchez knew (or was reckless in not knowing) that his access to the Confidential Database was intended to help the Investment Bank protect client confidences and to prevent others from violating them.  This evidence demonstrates more than a sufficient basis to infer that Sanchez traded with scienter.

 **C.** **The Commission Is Likely to Succeed in Proving That Sanchez Violated Section 14(e) of the Exchange Act and Rule 14e-3 Thereunder**

Section 14(e) of the Exchange Act [15 U.S.C. § 78n(e)] and Rule 14e-3 thereunder [17 C.F.R. § 240.14e-3] prohibit insider trading in the context of tender offers.  "If any person has taken a substantial step or steps to commence, or has commenced, a tender offer," the rule prohibits purchases or sales of securities by "any other person who is in possession of material information relating to such tender offer which information he knows or has reason to know is nonpublic and which he knows or has reason to know has been acquired directly or indirectly from" the offeror, the offeree, or anyone acting on behalf of either of them, "unless within a reasonable time prior to any purchase or sale such information and its source are publicly disclosed by press release or otherwise."  17 C.F.R. § 240.14e-3(a)(1)-(3).  Rule 14e-3 prohibits any person with such information from trading regardless of whether they owe a fiduciary duty with respect to the confidentiality of that information.  *See Chestman*, 947 F.2d at 557-60. Moreover, the trader need not know that the information relates to a tender offer to be liable under these provisions.  *See, e.g., SEC v. Sargent*, 229 F.3d 68, 78-79 (1st Cir. 2000); *SEC v. Anticevic*, No. 05-CV-6991 (KMW), 2010 WL 2077196, at *5 (S.D.N.Y. May 14, 2010).

After proving an insider trading violation of Section 10(b) and Rule 10b-5, the Commission must prove three additional elements to establish a violation of Section 14(e) and Rule 14e-3, that: (1) "substantial steps to commence" a tender offer had been taken before the

defendant traded; (2) the defendant's material, non-public information was "relating to such tender offer"; and (3) the defendant knew or had reason to know that he received the information from the offeror, offeree, or someone working on behalf of one of them.  17 C.F.R. § 240.14e-3(a); *see also SEC v. Musella*, 578 F. Supp. 425, 443 (S.D.N.Y. 1984) (specifying elements of Rule 14e-3 claim).  Meetings between the parties regarding the potential tender offer, retention of outside experts, and execution of consulting, confidentiality, or other preliminary agreements are all "substantial steps" towards a tender offer.  *See Mayhew*, 121 F.3d at 53.

Here, Sanchez violated Section 14(e) of the Exchange Act and Rule 14e-3 by purchasing AMAG and VIE securities—and the securities of a third Investment Bank client, HD Supply Holdings ("HDS"), which was acquired by The Home Depot (Rymas Decl. ¶ 50)—based on inside information regarding those entities' involvement in pending tender offers.  (*Id.* ¶¶ 41-50, 57-60 & Exh. 4 (rows 7, 12, and 20).)  In each case, Sanchez's trading occurred after the companies had taken "substantial steps to commence" the tender offer.  With respect to the AMAG deal, described *supra* pages 7-8, when Sanchez purchase AMAG call options and sold AMAG put options, AMAG had taken several steps towards commencing its tender offer with Covis Group, including retaining the Investment Bank, signing confidentiality agreements, conducting due diligence, and negotiating the tender offer price.  (*Id.* ¶ 43.)  Similarly, with respect to the VIE, described *supra* pages 9-10, and the HDS deal, when Sanchez purchased the respective VIE and HDS shares, VIE and HDS had each taken several steps towards commencing the respective tender offers, including retaining the Investment Bank, signing confidentiality agreements, negotiating the tender offer price, and discussing the proposed combination at meetings of its Board of Directors.  (*Id.* ¶¶ 50, 59.)

The second and third additional elements of Rule 14e-3 are also clearly satisfied with respect to the Sanchez's trading in advance of the AMAG, VIE, and HDS tender offers.  The information contained in the Confidential Database specifically related to the proposed tender offers.  The Confidential Database indicated that the Investment Bank had been retained by the offeror, the offeree, or a shareholder of the offeror.  (*Id.* ¶ 27.)  In other words, Sanchez knew, or was reckless in not knowing, considering his extensive daily experience working with the Confidential Database, that he received the information from the Investment Bank, which was working on behalf of the offeror, the offeree, or a shareholder of the offeror for each deal.

###### D.   <u>An Asset Freeze Is Appropriate Under the Circumstances</u>

The Commission seeks an order freezing Sanchez's assets in the United States, including but not limited to the Abellan Schwab Account, Gonzalez Tastyworks Account, the Sanchez Digital Asset Account, where Sanchez maintains U.S.-based assets (collectively, the "Subject Accounts").  The Subject Accounts remain active and have positive account balances.  The Commission also requests that the Court freeze any U.S.-based assets of the Relief Defendants, up to the amount of the ill-gotten gains they received (that is, the ill-gotten gains received into accounts *nominally* held by them), including any assets of the Relief Defendants in the either of the Abellan Schwab Account or Gonzalez Tastyworks Account.

###### 1.   ***The Court Should Freeze Sanchez's Assets in the Subject Accounts Because a Serious Risk Exists that Sanchez Will Move Them Beyond the Court's Reach***

Sanchez faces potential liability of more than $1.88 million:  over $471,700 in disgorgement; plus prejudgment accruing until a Final Judgment is entered; and a penalty of up to three times the disgorgement amount, or more than $1.4 million.  *See* 15 U.S.C. §§ 78u-1 and 78u(d)(5).  Currently, in the Abellan Schwab Account and the Gonzalez Tastyworks Account— which Sanchez controlled and through which he conducted substantial unlawful trading at issue

here—Sanchez maintains assets totaling approximately $329,902.  Sanchez also currently

maintains approximately $[27,829] in assets in the Sanchez Digital Asset Account.  An order

freezing these assets is appropriate because of the serious risk that those funds, which include

illicit proceeds of Sanchez's unlawful trading, will soon move beyond the jurisdiction of the

Court and may never be recovered.

An asset freeze is appropriate where the Commission demonstrates "(1) a concern that

defendants will dissipate their assets or transfer them beyond the jurisdiction of the United

States, and (2) a basis to infer that they traded on inside information." *Gonzalez de Castilla*, 145

F. Supp. 2d at 415.  As noted above, the standard is lower than the required showing for the

Commission to obtain a preliminary injunction against future violations of the securities laws.

*See supra* pages 14-16 (citing cases).

Here, the Commission has shown more than a basis to infer that Sanchez violated the

federal securities laws; it has made a *prima facie* case that he did so.  The Commission also has

demonstrated a significant and justified concern that Sanchez will transfer his assets beyond the

jurisdiction of this Court.  Sanchez is a foreign citizen who lives abroad and has access to foreign

financial institutions.  (Rymas Decl. ¶¶ 7, 52, 87.)  Courts have recognized a heightened risk in

cases, such as this one, that involve foreign defendants who easily could transfer assets outside

of the United States.  *See, e.g., SEC v. Dubovoy*, 2015 WL 6122261, at *9 ("[T]he fact that [the

defendant] who controls the foreign entities, lives abroad raises a serious concern that he may

transfer corporate funds beyond the Court's jurisdiction and dissipate the assets available for any

eventual award."); *SEC v. Well Advantage Ltd.*, No. 12-CV-5786 (RJS), Dkt. No. 35 at 3

(S.D.N.Y. Aug. 22, 2012) (freezing the assets of a foreign citizen to avoid dissipation of assets);

*SEC v. Anticevic*, No. 05-CV-6991 (KMW), 2005 WL 1939946, at *3 (S.D.N.Y. Aug. 5, 2005)

29

(same).  Indeed, Sanchez has already demonstrated a willingness to transfer assets out of a U.S.-based brokerage account to a foreign account beyond the reach of the Court.  As detailed above, on May 28, 2021, one day after Sanchez resigned from the Investment Bank—and after the Investment Bank had confronted him about certain suspicious activity—Sanchez began to transfer more than €50,000 out of the Abellan Interactive Brokers Account to a bank account in Spain.  *See* supra page 14.  An asset freeze, therefore, is necessary to preserve the status quo and preserve the remaining U.S.-based assets to satisfy a judgment in favor of the Commission.  *See, e.g., United States v. First Nat'l City Bank*, 379 U.S. 378, 385 (1965) (concluding an asset freeze was appropriate to prevent dissipation of assets or transfer of assets abroad); *SEC v. One or More Unknown Traders in Sec. of Bioverativ, Inc.*, No. 18-CV-00701 (JGK), 2018 WL 2244465, at *2 (S.D.N.Y. Feb. 9, 2018) (freezing assets of foreign defendants held in U.S. brokerage accounts in an insider trading case in order "to preserve the status quo and to protect this Court's ability to award relief in the form of disgorgement of illegal profits from the violations, prejudgment interest and civil penalties").

Asset freezes are designed to preserve enough assets to satisfy the full monetary relief the Commission may seek at the end of the case, including disgorgement and civil penalties.  *See Maillard*, 2014 WL 1660024, at *4.  The freeze order should preserve the "maximum" or complete amounts that the Commission might ultimately obtain.  *SEC v. Schiffer*, No. 97-CV-5853 (RO), 1998 WL 307375, at *7 (S.D.N.Y. June 11, 1998).  Here, Sanchez will be subject to liability of at least $1.88 million.  Because that potential liability exceeds the total amount of Sanchez's known U.S.-based assets, the Subject Accounts should be frozen in their entirety.  *See Unifund SAL*, 910 F.2d at 1041-42 (holding that a freeze order on a brokerage account in an amount equal to the potential disgorgement and civil monetary penalty was appropriate relief).

2.     ***The Court Should Also Issue an Order Freezing Any Relief Defendants'
Assets in the Subject Accounts***

The Court should also issue an Order freezing any U.S.-based assets of the Relief
Defendants located in either the Gonzalez Tastyworks Account or Abellan Schwab Account.
"A freeze order can apply to non-parties, such as relief defendants allegedly holding the funds of
defendants." *SEC v. Hedén*, 51 F. Supp. 2d 296, 299 (S.D.N.Y. 1999).  To obtain an asset freeze
against a relief defendant, the Commission must show that the relief defendant "(1) has received
ill-gotten funds; and (2) does not have a legitimate claim to those funds." *SEC v. Cavanagh*, 155
F.3d 129, 136 (2d Cir. 1988).

Here, the Commission has easily met both elements.  *First*, as demonstrated above, the
four brokerage accounts nominally held in the names of Abellan and Gonzalez names—*i.e.*, the
Gonzalez Interactive Brokers Account, Abellan Schwab Account, Gonzalez Tastyworks
Account, and Abellan Interactive Brokers Account (collectively, the "Nominal Brokerage
Accounts")—received ill-gotten proceeds from Sanchez's illegal insider trading totaling
approximately $471,700.  *See supra* pages 7-14.  Although Sanchez controlled and traded
through the Nominal Brokerage Accounts, the accounts are nominally held by the Relief
Defendants and, thus, they received those ill-gotten gains.  *Second*, neither Abellan nor Gonzalez
have a legitimate claim to any of those illegal insider trading proceeds.  Sanchez used the
Nominal Brokerage Accounts to make the illegal trades, as demonstrated by (1) Sanchez's role
in applying to open and setting up the Nominal Brokerage Accounts; (2) Sanchez's keeping
trading applications on his mobile phone for each of Interactive Brokers, Schwab, and
Tastyworks, despite that he had no account at any of those brokerages in his own name; and
(3) internet protocol records showing that Sanchez repeatedly accessed the Nominal Brokerage
Accounts, including to conduct trading at issue here.  The Commission is therefore likely to

31

show that neither Abellan nor Gonzalez provided consideration for the assets in the Nominal

Brokerage Accounts—which were themselves the proceeds of fraud—and, thus, have no

legitimate claim to them.  *See Cavanagh*, 155 F.3d at 137 ("The district court concluded that

neither [the relief defendant] nor her husband has a legitimate claim to the proceeds because the

SEC is likely to be able to show that he gave no consideration for the . . . shares and thus

received them as a gift.").  Accordingly, the Court should freeze any assets of Abellan and

Gonzalez in the Abellan Schwab Account and Gonzalez Tastyworks Account to prevent them

from using their nominal authority over these accounts to spirit those assets out of the Court's

jurisdiction.[5]

As discussed above, the potential disgorgement owed by the Relief Defendants stemming

from the unlawful trading in the Nominal Brokerage Accounts (*i.e.*, $471,700) exceeds the total

amount of known U.S.-based assets in brokerage accounts held nominally in Abellan's and

Gonzalez's names (*i.e.*, $329,902).  Thus, those accounts should be frozen in their entirety.

## II.    THE COURT SHOULD PROHIBIT THE DESTRUCTION OF DOCUMENTS AND AUTHORIZE EXPEDITED DISCOVERY

The Court should enter an order prohibiting Defendants from destroying or altering

documents, including documents concerning the allegations in the Complaint, the purchase or

sale of securities, or the assets of Defendants.  Such an order is necessary to preserve documents

that the Commission may seek through discovery requests and to help ensure a complete record

in this matter.  District courts routinely grant such orders "to preserve the status quo" and protect

the integrity of the litigation.  *SEC v. Spongetech Delivery Sys..*, No. 10-CV-2031 (DLI), 2011

WL 887940, at *5 (E.D.N.Y. Mar. 14, 2011) (citing *Unifund SAL*, 910 F.2d at 1040 n.11); *see*

_____

[5] All assets have already been transferred from the two of the Nominal Brokerage Accounts—the
Gonzalez Interactive Brokers Account and the Abellan Interactive Brokers Account.

*also One or More Unknown Traders in Sec. of the Gen. Commc'n, Inc.*, No. 17-CV-2659 (KPF), 2017 WL 1407514, at *2 (S.D.N.Y. Apr. 13, 2017) (finding that order prohibiting the alteration or destruction of documents "is necessary, to ensure, among other things, compliance with the asset freeze imposed on the Defendants' assets, and to protect the integrity of this litigation"); *SEC v. Lybrand*, No. 00-CV-1387 (SHS), 2000 WL 913894, at *12 (S.D.N.Y. July 6, 2000) (prohibiting the destruction and requiring the preservation of documents).

Similarly, the Commission requests expedited discovery in aid of its request for a preliminary injunction.  Expedited discovery is authorized by the Federal Rules of Civil Procedure.  *See* Fed. R. Civ. P. 26(d), 29, 30(a), 33(b), 34(b), 36(a).  District courts typically grant expedited discovery when "good cause" is shown, such as in anticipation of preliminary injunction hearings.  *See* Advisory Committee Notes to the 1993 amendments to Rule 26(d) ("[Expedited discovery] will be appropriate in some cases, such as those involving requests for a preliminary injunction.").  Courts routinely grant the Commission leave to take expedited discovery in anticipation of such a hearing.  *See, e.g.*, *SEC v. Ganamaneni, et al.*, No. 18-CV-11390 (ALC), Dkt. No. 3, at 8-9 (S.D.N.Y. Dec. 6, 2019) (ordering expedited discovery in advance of a preliminary injunction hearing); *SEC v. Aly*, No. 16-CV-3853 (PGG), Dkt. No. 3, at 5 (S.D.N.Y. May 24, 2016) (same); *SEC v. Ahmed*, No. 15-CV-00675 (JBA), Dkt. No. 34, at 2-3 (D. Conn. June 17, 2015) (same); *SEC v. Anticevic*, No. 05-CV-6991 (KMW), 2009 WL 361739, at *3 (S.D.N.Y. Feb. 13, 2009).

## III.    THE COURT SHOULD AUTHORIZE ALTERNATIVE SERVICE OF ALL PLEADING AND DOCUMENTS RELATED TO THE MOTION, ANY ORDER OF THE COURT, AND EXPEDITED DISCOVERY DEMANDS UPON DEFENDANTS

In addition to the means of service provided by the Federal Rules of Civil Procedure, the Commission asks the Court to authorize alternative service of all papers related to the Motion,

orders of the Court, and expedited discovery demands upon Defendants.  Federal Rule of Civil

Procedure 4(f)(3) allows service on an individual in a foreign country "by other means not

prohibited by international agreement, as the court orders."  "Service of process under Rule

4(f)(3) is neither a last resort nor extraordinary relief.  It is merely one means among several

which enables service of process on an international defendant."  *Madu, Edozie & Madu, P.C. v.

SocketWorks Ltd. Nigeria*, 265 F.R.D. 106, 115 (S.D.N.Y. 2010) (citation omitted).  "The

decision of whether to order service of process under Rule 4(f)(3) is 'committed to the sound

discretion of the district court.'"  *United States v. Lebanese Canadian Bank SAL*, 285 F.R.D.

262, 266 (S.D.N.Y. 2012) (quoting *Madu*, 265 F.R.D. at 115).  Further, a "plaintiff is not

required to attempt service through the other provisions of Rule 4(f) before the Court may order

service pursuant to Rule 4(f)(3) . . . ."  *FTC v. Pecon Software Ltd.*, No. 12-CV-7186 (PAE),

2013 WL 4016272, at *4 (S.D.N.Y. Aug. 7, 2013) (citing *Antisevic*, 2005 WL 1939946, at *3).

Courts have found that alternative service is appropriate where traditional service under

the Hague Convention on the Service Abroad of Judicial and Extra Judicial Documents in Civil

and Commercial Matters (the "Hague Service Convention") would take several months.  *See

In re GLG Life Tech Corp. Sec. Litig.*, 287 F.R.D. 262, 266-67 (S.D.N.Y. 2012) (granting service

through alternate means in a case involving a Chinese national, due to concern over length of

service to China under the Hague Convention would be approximately six to eight months); *see

also Rio Props. Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1015 (9th Cir. 2002) ("[T]he advisory

notes [to Rule 4] suggest that in cases of 'urgency,' Rule 4(f)(3) may allow the district court to

order a 'special method of service,' even if other methods remain incomplete or unattempted.").

Here, the Commission anticipates that service in Spain via the Hague Service Convention could

take many months, including to translate documents and submit them to Spain's Central

Authority for local service.  *See* Hague Conference, "Spain – Central Authority & practical information," https://www.hcch.net/en/states/authorities/details3/?aid=273 (last visited September 28, 2021).

Accordingly, the Commission requests that the Court authorize service of all papers and pleadings related to the Motion, including the Complaint, any Order of the Court, and expedited discovery demands upon all Defendants by (i) email to Defendants and/or (ii) by email or overnight mail delivery to the respective brokers and digital asset exchange (Schwab, Tastyworks, and Bitstamp USA, Inc. ("Bitstamp")) at which Defendants maintain accounts with instruction for the brokers and digital asset exchange to forward the documents to the respective Defendant at the address (including email address) on file for that Defendant.  This proposed method of service is calculated to provide Defendants with actual notice of this case expeditiously and has been approved by courts in similar circumstances.  *See, e.g.*, *Unifund SAL*, 910 F.2d at 1033-34 (affirming district court's order providing for alternative service upon foreign defendant through defendant's broker, and finding that "service abroad may be made through an intermediary located in this country"); *SEC v. Cohen, et al.*, No. 19-CV-9645 (CM), Dkt. No. 3, at 5 (S.D.N.Y. Oct. 22, 2019) (authorizing service of all documents related to temporary restraining order by email ); *Aly*, No. 16-CV-3853 (PGG), Dkt. No. 3, at 3 (authorizing service of temporary restraining order and related papers by simultaneous email to defendant and delivery to defendant's United States broker); *SEC v. Pointer Worldwide Ltd.*, No. 09-CV-6162 (DLC), Dkt. No. 5, at 2 (S.D.N.Y. July 23, 2009) (authorizing service via defendants' broker).

As noted above, the Abellan Schwab Account, Gonzalez Tastyworks Account, and Sanchez's Digital Asset account, all of which the Commission seeks to freeze, remain active and

have positive account balances.  (Rymas Decl. ¶¶ 86-88.)  In light of the assets in the respective accounts, Defendants are likely to continue to keep their contact information with the respective brokerage firms (Schwab and Tastyworks) and digital asset exchange (Bitstamp) up-to-date.

Without alternative means of service, it is unlikely that service pursuant to Federal Rule of Civil Procedure 4(f) will be completed prior to the return date on the Commission's motion for a preliminary injunction.  Given the short timeframe allowed for converting a temporary restraining order into a preliminary injunction under Federal Rule of Civil Procedure 65(b)(2), service by these alternative means is necessary to give Sanchez, Gonzalez, and Abellan a meaningful opportunity to respond to the Commission's application for a preliminary injunction. Service by email and via the United States-based brokerage firm and digital asset exchange will expeditiously provide the foreign Defendants with notice of the case and any upcoming deadline.

## IV.   THE COURT SHOULD ORDER THE DEFENDANTS TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT BE ENTERED

The Commission requests that the Court enter an order requiring Defendants to show cause why a preliminary injunction imposing the same relief as set forth in the temporary restraining order should not be entered.  The Commission further requests that the Court schedule a preliminary injunction hearing within fourteen days of the entry of the temporary restraining order, or on another date prior to the expiration of the *ex parte* emergency order.  *See* Fed. R. Civ. P. 65(b)(2).  At that hearing, the Commission will seek to enter a preliminary injunction against further violations of the federal securities laws at issue and to extend the asset freeze and other equitable relief requested herein.  To preserve resources of the Court and the parties, the Commission also seeks an order that deems the Commission's Motion and supporting brief to be a motion for a preliminary injunction pursuant to Federal Rule of Civil Procedure 65.

All materials submitted by the Commission in support of its current Motion equally support the need for a preliminary injunction in this matter.

## V.     ENTRY OF AN *EX PARTE* TEMPORARY RESTRAINING ORDER IS APPROPRIATE

Under Federal Rule of Civil Procedure 65(b), an *ex parte* temporary restraining order may be entered if (1) it appears from specific facts shown by affidavit that immediate and irreparable injury, loss, or damage will result before the adverse party can be heard in opposition; and (2) the applicant's attorney certifies the reasons supporting the claim that notice should not be required.  As explained in the Declaration of Assunta Vivolo, filed herewith, the Commission is concerned that if Defendants become aware of this action before the asset freezes are instituted, Defendants will move their assets beyond the jurisdiction of the Court.  Accordingly, *ex parte* relief is necessary to prevent the Defendants from removing funds from the accounts of which the Commission is aware.

## CONCLUSION

For the foregoing reasons, the Court should grant the Commission's emergency application.

Dated:  New York, New York
        September 29, 2021

 _s/ Assunta Vivolo_____
Joseph G. Sansone
Assunta Vivolo
David Snyder*
Christopher M. Colorado
Securities and Exchange Commission
Philadelphia Regional Office
1617 JFK Boulevard, Suite 520
Philadelphia, Pennsylvania 19103
(215) 597-1047 (Vivolo)
VivoloA@sec.gov

*Not admitted in S.D.N.Y.