UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION,

        Plaintiff,

    v.

JOSE LUIS CASERO SANCHEZ,

        Defendant,

    and

JOSE LUIS CASERO ABELLAN, and
MARIA ISABEL SANCHEZ
GONZALEZ,

        Relief Defendants.

Civil Action No. _____

JURY TRIAL DEMANDED

---

## COMPLAINT

Plaintiff United States Securities and Exchange Commission ("the Commission"), for its

Complaint against Defendant Jose Luis Casero Sanchez ("Sanchez") and Relief Defendants Jose

Luis Casero Abellan ("Abellan") and Maria Isabel Sanchez Gonzalez ("Gonzalez"), alleges as

follows:

### SUMMARY OF THE ACTION

1.     This action involves repeated acts of insider trading by Defendant Sanchez, who

abused his position of trust as a Senior Analyst in the Compliance Division of a prominent

United States-based investment bank ("Investment Bank") to reap hundreds of thousands of

dollars in illegal trading profits.  Sanchez worked in the Control Room in the Investment Bank's

office in Warsaw, Poland.  In that position, the Investment Bank entrusted Sanchez with access

to material, nonpublic information concerning pending and potential transactions in which the

Investment Bank was involved and advising clients, including mergers, tender offers, and financings.  Sanchez was given this broad access to highly sensitive information so that, as a compliance analyst, he could assist the Investment Bank's efforts to, among other things, monitor and control the flow of material, nonpublic information between the "private" and "public" sides of the firm and prevent and detect employee insider trading.

2.      Between September 2020 and May 2021, Sanchez abused his position of trust and confidence at the Investment Bank by accessing and misappropriating sensitive information concerning at least 45 mergers and acquisitions, tender offers, financing transactions, and other significant corporate events involving the Investment Bank's clients and/or potential clients (the "Deals").  Sanchez then unlawfully traded on the basis of that information, which resulted in him obtaining at least $471,700 in illicit profits.

3.      Sanchez attempted to distance himself from the unlawful trading activity by trading in four U.S.-based brokerage accounts, each of which was in the name of one of his parents:  his father, Abellan; and his mother, Gonzalez.

4.      By engaging in the conduct described in this Complaint, the Defendant violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q], and Sections 10(b) and 14(e) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b), 78n(e)] and Rules 10b-5 and 14e-3 thereunder [17 C.F.R. §§ 240.10b-5, 240.14e-3].

## NATURE OF PROCEEDING AND RELIEF SOUGHT

5.      The Commission brings this action under Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Sections 21(d) and 21A of the Exchange Act [15 U.S.C. §§ 78u(d), 78t-1]. The Commission seeks a permanent injunction against the Defendant, to enjoin him from engaging in the transactions, acts, practices, and courses of business alleged in this Complaint;

freezing of assets located in the United States; disgorgement of profits realized from the unlawful

insider trading set forth herein and prejudgment interest from the Defendant; disgorgement from

the Relief Defendants; and civil monetary penalties from the Defendant pursuant to Section 21A

of the Exchange Act [15 U.S.C. § 78u-1]; and for such other relief as the Court may deem just

and appropriate.

### JURISDICTION AND VENUE

6.      This Court has jurisdiction over this action under Sections 20(b) and 22(a) of the

Securities Act [15 U.S.C. §§ 77t(b) and 77v(a)] and Sections 21(d), 21(e), 21A, and 27 of the

Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), 78u-1, and 78aa].  Certain of the acts, practices,

transactions, and courses of business constituting the violations made use of a means or

instrumentality of interstate commerce, or of the mails, and/or of the facilities of national

securities exchanges.

7.      Venue in this District is proper under Section 22(a) of the Securities Act [15

U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa], because certain of the

acts, practices, transactions, and courses of business constituting the violations alleged in this

Complaint occurred in the Southern District of New York.  At all times relevant to this action,

the securities Sanchez traded illegally were traded on United States stock exchanges.  The

Defendant placed unlawful trades on the New York Stock Exchange ("NYSE"), the NASDAQ

Stock Exchange, and the NASDAQ Options Market, each of which is located in this judicial

district.  In addition, the counterparties to certain of these unlawful trades were market makers

located in this judicial district.  Further, the Defendant worked for the Investment Bank, which is

headquartered in New York, New York.

**THE DEFENDANT**

8.      **Jose Luis Casero Sanchez ("Sanchez")**, age 35, is a Spanish national who resided in Krakow, Poland from at least September 2, 2019 until on or about November 2, 2020 and in Warsaw, Poland from on or about November 2, 2020 until on or about May 27, 2021. Sanchez's last known address is in Granada, Spain.  From September 2, 2019 through on or about May 27, 2021, Sanchez worked in the Warsaw, Poland office of the Investment Bank, whose global headquarters are in New York City.  On or about May 27, 2021, Sanchez resigned from the Investment Bank.  The Investment Bank provides financial advisory and other services to publicly traded companies in connection with strategic transactions, including financing transactions and business combinations such as mergers and acquisitions.

**RELIEF DEFENDANTS**

9.      **Jose Luis Casero Abellan ("Abellan")**, age 60, is a Spanish national with a last known address in Granada, Spain.  In or about December 2020, a brokerage account in Abellan's name was opened at Charles Schwab & Co., Inc. ("Schwab" and the "Abellan Schwab Account").  Sanchez repeatedly used the Abellan Schwab Account to place illicit trades based on his knowledge of the Deals.  The Abellan Schwab Account remains open.  In or about March 2021, a brokerage account in Abellan's name was opened at Interactive Brokers, LLC ("Interactive Brokers" and the "Abellan Interactive Brokers Account").  Sanchez repeatedly used the Abellan Interactive Brokers Account to place illicit trades based on his knowledge of the Deals.  Between June 17 and July 13, 2021, after Sanchez had resigned from the Investment Bank, all of the assets in the Abellan Interactive Brokers Account were liquidated and transferred to a bank account in Spain.

10.     **Maria Isabel Sanchez Gonzalez ("Gonzalez")**, age 61, is a Spanish national with a last known address in Granada, Spain.  In or about August 2020, a brokerage account in Gonzalez's name was opened at Interactive Brokers (the "Gonzalez Interactive Brokers Account").  In or about November 2020, Interactive Brokers closed the Gonzalez Interactive Brokers Account.  In or about January 2021, a brokerage account in Gonzalez's name was opened at Tastyworks, Inc. ("Tastyworks" and the "Gonzalez Tastyworks Account").  The Gonzalez Tastyworks Account remains open.  Sanchez placed illicit trades based on his knowledge of the Deals in the Gonzalez Interactive Brokers Account and the Gonzalez Tastyworks Account.

### RELEVANT ENTITIES

11.     The **Investment Bank** is a multinational investment bank and financial services company that maintains offices in major financial centers around the world, including Warsaw, Poland and New York, New York.

12.     **The 45 Companies identified in the Appendix** were, at the relevant time, publicly traded companies that traded under the identified ticker symbols on United States exchanges.  Each of these companies was involved in one of the Deals, *i.e.*, a merger, acquisition, tender offer, financing transaction, or other significant corporate event that was advised by, underwritten by, and/or otherwise involving the Investment Bank.  Each company's stock or warrants were registered with the Commission under Section 12(b) of the Exchange Act.

### TERMS USED IN THIS COMPLAINT

A.     **Options**

13.     A stock option, commonly referred to as an "option," gives its purchaser-holder the option to buy or sell shares of an underlying stock at a specified price (the "strike price")

5

prior to the expiration date.  Options are generally sold in a "contract," which gives the option

holder the opportunity to buy or sell 100 shares of an underlying stock.

14.     A "call" option contract gives its purchaser-holder the right, but not the

obligation, to purchase 100 shares of an underlying stock at a specified share price within a

specific time period.  Generally, the buyer of a call option anticipates that the price of the

underlying security will increase during a specified amount of time.

15.     A "put" option contract gives its purchaser-holder the right, but not the obligation,

to sell 100 shares of the underlying stock at a strike price on or before the expiration date.

Generally, the buyer of a put option contract expects that the price of the underlying security will

decrease on or before the expiration date.  However, the person who "sells to open" (a/k/a writes)

a put option contract collects a premium from the buyer up front and the seller (writer) also

anticipates that the price of the underlying security will increase on or before the expiration date.

If the underlying stock price is higher than the put option's strike price at expiration, the put

option will expire worthless on the expiration date and the seller (writer) of the put option

realizes a profit by simply keeping the premium proceeds that had earlier been received.

Similarly, the seller (writer) of the put option can also buy to close their short put option position

at any time to realize potential profits, especially if the market price of the put option has since

dropped in the market.  However, if the underlying stock price goes below the put option's strike

price on or before the expiration date, the put option seller may be obligated to purchase the

underlying securities from the buyer at the higher-than-market strike price set forth in the put

option contract.

**B.      SPACs and Warrants**

16.     A Special Purpose Acquisition Company ("SPAC") has no operations of its own

and is formed to raise capital through an initial public offering ("IPO") for the purpose of using

the proceeds to acquire an unspecified private company at a later, unspecified date, but usually within 24 months, effectively taking the private company public.

17.      Generally, in a SPAC IPO investors purchase "units." Each "unit" consists of one share of common stock and a fraction of a warrant that can later be used to purchase common stock from the company at a specified price. Following the IPO, the components comprising the "units" become separable, such that the investor can trade units, shares, or warrants. Each of these securities is listed separately on U.S. securities exchanges.

**C.      Internet Protocol Address**

18.      An Internet protocol ("IP") address is a unique number that gets linked to online activity conducted by a computer or other device connected to the internet.

## FACTUAL ALLEGATIONS

**A.      <u>Sanchez's Access to Material, Nonpublic Information and Duties to Maintain Confidentiality</u>**

19.      In or about September 2019, Sanchez began working as a Senior Analyst in the Compliance Division of the Investment Bank. Sanchez was an employee in the Control Room in the Investment Bank's office in Warsaw, Poland. Sanchez was a member of the team responsible for monitoring and controlling the flow of confidential information between the firm's private-side businesses (*e.g.*, Investment Banking) and the public-side businesses (*e.g.*, Sales, Trading, Research, and Investment Management), and for implementing the Investment Bank's policies and procedures designed to, among other things, ensure that its employees did not trade on material, nonpublic information. In his position at the Investment Bank, Sanchez had direct access to, and was entrusted with, material, nonpublic information regarding upcoming mergers and acquisitions and financing transactions in which the Investment Bank was involved.

20.    In addition to ensuring that others at the Investment Bank were maintaining the confidentiality of material, nonpublic information, Sanchez also had a duty to safeguard confidential information at the Investment Bank and was prohibited from trading on the basis of material, nonpublic information that he obtained in the course of his work.

21.    Sanchez's employment contract at the Investment Bank provided, in part:

> In connection with your employment by the Employer, you may have access to non-public information and materials, including but not limited to information and materials describing or relating to the business and financial affairs, personnel matters, operating procedures, organisational responsibilities, marketing matters, and policies or procedures of the Employer or [the Investment Bank] . . . ("Confidential and Proprietary Information and Materials"). With respect to such Confidential and Proprietary Information and Materials, you agree that:

> - Confidential and Proprietary Information and Materials shall be used only as authorised and only for the purposes intended by the Employer or [the Investment Bank];

> - you will hold all Confidential and Proprietary Information and Materials in strict confidence and, except for the above authorised uses, will not, nor will you permit any agent to give, disclose, copy, reproduce, sell, assign, license, market or transfer Confidential and Proprietary Information and Materials to any person, firm or corporation . . . who does not have a need to know or see the Confidential and Proprietary Information and Materials . . . .

22.    Sanchez signed the employment agreement, accepting its terms and conditions, on July 29, 2019.

23.    Sanchez and all other personnel of the Investment Bank were subject to an internal compliance policy entitled, "Firmwide Policy Regarding the Safeguarding of Confidential Information and Information Barriers" ("Confidential Information Policy"), which, during the relevant period, expressly stated:

> Personnel who are aware of [material, nonpublic information] about an entity or its Financial Instruments[], regardless of their information barrier status and/or how they received such information:

- must maintain the confidentiality of any such information received and may use it only for the business purposes for which it was disclosed; … [and]

- are restricted from executing, directing, soliciting, advising on, recommending or influencing any transaction[] in any applicable Financial Instrument of the entity ("Trading") (i) for their personal or related accounts, or (ii) on behalf of the firm, a customer, or any syndicate account[] . . . .

24.     Sanchez and all other personnel of the Investment Bank were also subject to an internal compliance policy entitled, "Personal Trading" ("Personal Trading Policy"), which, during the relevant time period, required employees to disclose any "Covered Accounts" to the Investment Bank's Compliance Department.  Covered Accounts are brokerage accounts in which financial instruments (such as stocks, options, and other securities) can be purchased, sold, or held, and Covered Accounts include:

accounts controlled or directed by Personnel or their Related Persons, or in which Personnel or their Related Persons have a beneficial interest, including:

- accounts in the name of a Firm Individual or their Related Person; [and]

- accounts over which a Firm Individual or their Related Person has discretion or authority to direct investments or can influence investment decisions . . . .

25.     In addition, Sanchez and all other personnel of the Investment Bank were required to pre-clear trades in a Covered Account.  As part of the pre-clearance process, Sanchez and all other personnel of the Investment Bank were required to "certify, among other things, that they are not aware of material, non-public information regarding the Financial Instrument (or, for derivative instruments, regarding the underlier thereof)."

26.      Sanchez did not disclose to the Investment Bank that he controlled or directed trades in the Abellan Schwab Account, the Abellan Interactive Brokers Account, the Gonzalez Interactive Brokers Account, or the Gonzalez Tastyworks Account.  In addition, Sanchez did not

9

pre-clear with the Investment Bank any of the trades that he placed in each of those brokerage accounts.

27.     Sanchez understood his confidentiality, trading, disclosure, and pre-clearance obligations.  On or about September 4, 2019, January 23, 2020, and February 9, 2021, Sanchez certified that he had reviewed and understood the Investment Bank's Personal Trading Policy and its Confidential Information Policy, among others.  In each of these certifications, Sanchez also certified to the Investment Bank that he did not have any brokerage or managed accounts held outside of the Investment Bank to disclose.

28.     In addition, Sanchez successfully completed numerous training courses regarding his obligations to maintain the confidentiality of material, nonpublic information and the prohibition against insider trading.  For example, on September 5, 2019, Sanchez successfully completed a training course entitled "[Investment Bank's] Code of Business Conduct and Ethics," which emphasized the need to protect confidential information from public disclosure. On April 2, 2020, Sanchez also successfully completed the course entitled "[Investment Bank] Compliance:  Insider Trading Training," which addressed the prohibition against trading based on confidential information obtained through his work at the Investment Bank.

29.     Further, as a member of the Compliance Division, Sanchez also completed additional yearly trainings on these subjects.  For example, on October 16, 2019 and December 29, 2020, Sanchez successfully completed a training entitled "Global Compliance: Annual Training for Compliance," which covered the Investment Bank's policies, procedures, and restrictions concerning employees' outside brokerage accounts, personal trading, and obligations to protect confidential information, among other things.

**B.**      **Sanchez Accessed Material, Nonpublic Information Concerning the Deals**

30.      In his position at the Investment Bank, Sanchez had direct access to, and was entrusted with, material, nonpublic information regarding all of the upcoming mergers and acquisitions, financing transactions and other transactions in which the Investment Bank was involved.

31.      Sanchez worked in the Control Room in Warsaw, Poland; one of eight Control Rooms the Investment Bank maintains globally.  The Control Room is primarily responsible for preserving the integrity of the Investment Bank's information barriers by monitoring and controlling the flow of material, nonpublic information between the firm's private-side businesses (*e.g.*, Investment Banking) and the public-side businesses (*e.g.*, Sales, Trading, Research, and Investment Management).  Among other things, this includes monitoring and/or restricting sales, trading and/or research activities in certain companies and their securities, and facilitating compliance with various regulatory and securities law mandates.

32.      One of Sanchez's duties was to update the firm's "Grey List," which is a confidential list of public and private entities for which the firm's private-side personnel possess material, nonpublic information.

33.      Typically, Grey List entities are involved in merger and acquisition activity and financings such as public and private securities offerings, among other things.  If an entity is on the Grey List, certain controls at the Investment Bank may be implicated, including but not limited to, surveillance of firm and client trading activities in the securities of the company on the list, and the denial of certain employees' personal trade requests in the securities of the company on the list.

34.      The Grey List is maintained on an internal database at the Investment Bank (the "Confidential Database").  The Confidential Database is the depository where material,

nonpublic information about potential transactions involving the Investment Bank is stored.  For each transaction, the Confidential Database may include, but is not limited to:  the names of the public and private entities involved in the potential or pending transaction; the firm's role in the transaction; the nature of the transaction; the securities involved; the type of financing involved; the size of the transaction; pricing information; the projected announcement date; and other material, nonpublic details regarding the potential transaction.

35.     While employed at the Investment Bank, Sanchez routinely had access to, and was entrusted with, material, nonpublic information about transactions in which the Investment Bank was involved (including, but not limited to, the Deals) through the Confidential Database and other sources.  For example, Sanchez routinely accessed the Confidential Database in the ordinary course of his employment in order to, among other things, update it with information he received from members of the firm's Investment Banking Division regarding potential mergers and acquisitions, tender offers, SPAC transactions, and financing transactions.  In addition, Sanchez routinely received and/or had access to emails containing material, nonpublic information about potential transactions in which the Investment Bank was involved.

36.     Access logs for the Confidential Database, as well as other documents and information, show that Sanchez updated, directly accessed, possessed, and/or had access to material, nonpublic information relating to all of the Deals prior to placing trades in connection with each of the Deals.

C.    **Sanchez Used Brokerage Accounts In His Parents' Names to Trade on Material, Nonpublic Information**

37.     Between September 2020 and May 2021, Sanchez traded profitably on at least 45 Deals based on material, nonpublic information he misappropriated from the Investment Bank. Sanchez traded through four U.S.-based brokerage accounts, each of which is nominally held in

the name of one of his parents.  Specifically, Sanchez traded in:  (1) the Gonzalez Interactive Brokers Account; (2) the Abellan Schwab Account; (3) the Gonzalez Tastyworks Account; and (4) the Abellan Interactive Brokers Account (collectively, the "Nominal Brokerage Accounts"). See Appendix.  The Appendix sets forth information regarding the 45 Deals on which Sanchez traded, including the name of the entity whose securities Sanchez traded, the public announcement date of the event, the type of event that was announced, the percentage change that the announcement had on the price of the entity's stock, and, for each Deal, the approximate profits earned in each of the accounts that Sanchez used to trade on the Deal.  All of the information set forth in the Appendix is incorporated herein by reference.

38.     Initially, Sanchez traded on the Deals exclusively in the Gonzalez Interactive Brokers Account.  In November/December 2020, however, Interactive Brokers closed the Gonzalez Interactive Brokers Account.

39.     Shortly thereafter, Sanchez began trading on the Deals in a newly-opened Abellan Schwab Account and a newly-opened Gonzalez Tastyworks Account.  In March 2021, Sanchez also began trading on the Deals in a recently-opened Abellan Interactive Brokers Account. Sanchez alternated in which accounts he traded on the Deals, presumably to avoid detection.

40.     Sanchez perpetrated this insider trading scheme by trading on information from the Confidential Database relating to mergers and acquisitions (including three tender offers), SPAC deals, and financing transactions.  See Appendix.

41.     Sanchez traded a variety of securities in these four brokerage accounts, including buying stock, buying call options, buying puts, "selling to open" (a/k/a writing) puts, and buying warrants.

42.     Although the four brokerage accounts involved in this scheme are nominally in his parents' names, Sanchez controlled the trading surrounding the Deals in these four brokerage accounts.

43.     Sanchez had apps on his mobile telephone that would enable him to access brokerage accounts at Interactive Brokers, Schwab, and Tastyworks.  However, Sanchez does not have any known brokerage accounts in his own name at any of these broker-dealers.

44.     IP address logs from Interactive Brokers, Schwab, Tastyworks, and other entities show that the Abellan Schwab Account, the Abellan Interactive Brokers Account, the Gonzalez Interactive Brokers Account, and the Gonzalez Tastyworks Account were routinely accessed using various IP addresses that are directly connected to Sanchez.  For example, many of the IP addresses used to access and/or trade through those four brokerage accounts either:  (a) geolocate to Poland, where Sanchez lived; (b) were used by Sanchez to log into the Investment Bank's remote work platform; and/or (c) were used by Sanchez to log into an account in his name at a U.S.-based digital asset trading platform.

### 1.  **The Gonzalez Interactive Brokers Account**

45.     On August 16, 2020, an application was submitted to Interactive Brokers to open an account in the name of Gonzalez, Sanchez's mother.

46.     On August 17, 2020, Interactive Brokers sent an email to an address bearing Gonzalez's name asking for certain documentation to complete the application process.

47.     That same day, August 17, 2020, Sanchez uploaded at least one document to Interactive Brokers.

48.     On August 27, 2020, Interactive Brokers approved the application to open an account in Gonzalez's name and the account was formally opened.

14

49.     From September 9, 2020 through at least November 20, 2020, Sanchez used the Gonzalez Interactive Brokers Account to place trades based on material, nonpublic information about at least twelve different Deals.  See Appendix.

50.     For example, according to the Investment Bank's Confidential Database access logs, on September 23, 2020 at 9:40 a.m. ET, Sanchez accessed the Confidential Database to input information regarding Covis Group S.à r.l.'s ("Covis Group") proposed tender offer to acquire one of the Investment Bank's clients, AMAG Pharmaceuticals, Inc. ("AMAG").

51.     Later that day, on September 23, 2020 at 3:37 p.m. ET, Sanchez entered a limit order in the Gonzalez Interactive Brokers Account to "sell to open" (a/k/a write) ten AMAG put options, with a strike price of $10 and an expiration of November 20, 2020, at $1.70 per contract. The order was executed immediately.  On that day, AMAG stock closed at $8.88 per share.

52.     By September 23, 2020, Covis Group and AMAG had already taken substantial steps to commence the tender offer, including but not limited to, AMAG hiring the Investment Bank as a financial adviser, entering into a confidentiality agreement, conducting due diligence, and negotiating the price of the tender offer.

53.     Between September 23, 2020 and September 29, 2020, Sanchez "sold to open" (wrote) additional AMAG put options in the Gonzalez Interactive Brokers Account as follows:

| Trade Date | Number of Contracts | Expiration / Strike Price | Price per Contract (x100 Shares) |
|---|---|---|---|
| Sept. 23, 2020 | 5 | Nov. 20, 2020 Puts / $11 | $2.60 |
| Sept. 25, 2020 | 10 | Nov. 20, 2020 Puts / $10 | $1.80 |
| Sept. 29, 2020 | 5 | Oct. 16, 2020 Puts / $11 | $1.90 |

Between September 23, 2020 and September 29, 2020, AMAG shares traded between $8.62 per share and $9.39 per share.

54.     Between Sept. 23, 2020 and Sept. 29, 2020, Sanchez also bought AMAG call options in the Gonzalez Interactive Brokers Account as follows:

| Trade Date | Number of Contracts | Call Expiration / Strike Price | Price per Contract (x100 Shares) |
| --- | --- | --- | --- |
| Sept. 23, 2020 | 15 | Oct. 16, 2020 Calls / $10 | $0.35 |
| Sept. 23, 2020 | 15 | Oct. 16, 2020 Calls / $10 | $0.30 |
| Sept. 25, 2020 | 10 | Oct. 16, 2020 Calls / $10 | $0.30 |
| Sept. 25, 2020 | 20 | Oct. 16, 2020 Calls / $10 | $0.30 |
| Sept. 28, 2020 | 10 | Oct. 16, 2020 Calls / $11 | $0.15 |
| Sept. 28, 2020 | 10 | Oct. 16, 2020 Calls / $11 | $0.10 |
| Sept. 29, 2020 | 10 | Oct. 16, 2020 / $10 | $0.30 |
| Sept. 29, 2020 | 10 | Oct. 16, 2020 / $11 | $0.10 |

55.     On October 1, 2020, Covis Group announced it was commencing a tender offer to acquire all of the outstanding shares of AMAG for a purchase price of $13.75 per share in cash, or approximately $647 million.  On this announcement, the price for AMAG shares increased by approximately 45.21%, from $9.40 per share to $13.65 per share.  See Appendix.

56.     Between October 1 and October 2, 2020, Sanchez sold all of his AMAG call options in the Gonzalez Interactive Brokers Account, obtaining over $30,940 in illicit profits.  In total, by trading AMAG put and call options in the Gonzalez Interactive Brokers Account Sanchez obtained illicit profits of over $36,600.  See Appendix.

57.     Sanchez also profited from the selling to open AMAG put options in the Gonzalez Interactive Brokers Account.  Between September 23 and September 29, 2021, Sanchez collected over $5,750 in premiums for writing the AMAG put options identified above. Following the announcement of AMAG's acquisition, the price of AMAG stock rose sharply and traded above the strike price of the AMAG put options and caused the options to expire worthless on their respective expiration dates.  As a result, Sanchez was able to keep the premiums he obtained for writing these put options without having any of the options exercised against him.  See Appendix.

58.     Between September 9, 2020 and November 20, 2020, Sanchez obtained approximately $108,904 in illicit profits trading based on material, nonpublic information regarding at least twelve different Deals in the Gonzalez Interactive Brokers Account.  See Appendix.

59.     On November 16, 2020, Interactive Brokers sent an email to the email address associated with the Gonzalez Interactive Brokers Account advising that Interactive Brokers had decided to terminate its customer relationship and advising that the assets in the account must be liquidated and transferred by December 16, 2020, when the account would be closed.

60.     Between November 16 and December 16, 2020, approximately €140,600 was transferred from the Gonzalez Interactive Brokers Account to banks in Spain.

## 2.  The Abellan Schwab Account

61.     On December 21, 2020, five days after Interactive Brokers closed the Gonzalez Interactive Brokers Account, an application was submitted online to Schwab to open an account in Abellan's name.  The IP address used to submit the application was an IP address directly tied to Sanchez—he also used this same IP address to log into the Investment Bank's remote work

platform, his digital asset account, and all three other brokerage accounts involved in this scheme.

62.     On December 21, 2020, the Abellan Schwab Account was officially opened.

63.     From January 11, 2021 through at least May 26, 2021, Sanchez placed trades based on his knowledge of at least twenty Deals through the Abellan Schwab Account.  See Appendix.

64.     For example, according to the Investment Bank's Confidential Database access logs, from December 4 through December 18, 2020, Sanchez accessed the Confidential Database several times to input and/or access information regarding Horizon Therapeutics' proposed tender offer to acquire one of the Investment Bank's clients, Viela Bio, Inc. ("VIE").  The transaction was publicly announced on February 1, 2021.

65.     On January 13 and January 22, 2021, Sanchez placed limit orders, collectively, to buy a total of 400 shares of VIE stock in the Abellan Schwab Account as follows:

| Trade Date | Number of Shares | Price per Share |
|---|---|---|
| Jan. 13, 2021 | 200 | $36.25 |
| Jan. 22, 2021 | 200 | $34.40 |

66.     By January 13, 2021, Horizon Therapeutics and VIE had already taken substantial steps to commence the tender offer, including but not limited to, hiring the Investment Bank as a financial adviser, entering into a confidentiality agreement, conducting due diligence, negotiating the price of the tender offer, and discussing the proposed combination at board of directors meetings.

67.     On February 1, 2021, following the public announcement of the tender offer, the price for VIE shares increased by 52.26%.  See Appendix.  That day, February 1, 2021, Sanchez sold all 400 shares of VIE in the Abellan Schwab Account, obtaining a profit of approximately $7,009.  See Appendix.

68.     Between January 11, 2021 and May 26, 2021, Sanchez obtained approximately $78,198 in illicit profits trading based on material, nonpublic information regarding at least twenty different Deals in the Abellan Schwab Account.  See Appendix.

### 3.  The Gonzalez Tastyworks Account

69.     On or about December 26, 2020, ten days after Interactive Brokers closed the Gonzalez Interactive Brokers Account, Sanchez submitted an account application to Tastyworks to open another brokerage account in Gonzalez's name.

70.     At 12:11:25 p.m. ET on December 26, 2020, Tastyworks sent an email to an email address bearing Gonzalez's name asking to verify the email address to confirm that the account belonged to the applicant by clicking a link included in the email.  Sanchez had direct access to the email account bearing Gonzalez's name to which Tastyworks sent the December 26, 2020 email.

71.     On December 26, 2020 at 12:11 p.m. ET, Sanchez clicked the link in the Tastyworks email identified above from his mobile telephone, verifying the email address associated with the brokerage account being opened in Gonzalez's name.

72.     From January 13, 2021 through at least May 21, 2021, Sanchez placed trades based on material, nonpublic information about at least thirteen Deals through the Gonzalez Tastyworks Account.  See Appendix.

73.     For example, according to the Investment Bank's Confidential Database access logs, between December 4, 2020 and February 1, 2021, Sanchez accessed the Confidential

19

Database several times to view and/or input data regarding Jazz Pharmaceuticals' acquisition of G.W. Pharmaceuticals plc ("GWPH"), a client of the Investment Bank, which was announced on February 3, 2021.  Specifically, on February 1, 2021, Sanchez accessed the Confidential Database regarding the GWPH merger at 6:04 a.m. ET.

74.     Later that day, at 2:11 p.m. ET on February 1, 2021, Sanchez bought 15 GWPH call options, with a $165 strike price and an expiration date of February 19, 2021, at $2.00 per contract in the Gonzalez Tastyworks Account.  When Sanchez purchased the GWPH call options, GWPH's shares were trading at approximately $146 per share.

75.     After the public announcement of the GWPH merger, on February 3, 2021, the price for GWPH shares increased by 44.53%, from $146.25 per share to $211.37 per share.  See Appendix.  That same day, February 3, 2021, at approximately 9:31 a.m. ET, Sanchez sold all 15 GWPH call options in the Gonzalez Tastyworks Account for a profit of approximately $70,484. See Appendix.

76.     Sanchez also traded in advance of numerous securities offerings in which the Investment Bank was involved as an underwriter.  See Appendix.  For example, according to the Investment Bank's Confidential Database access logs, on March 4, 2021 at approximately 4:31 a.m. ET, Sanchez accessed the Confidential Database to input and/or access information regarding Norwegian Cruise Line Holdings Ltd.'s ("NCLH") upcoming equity offering, which was publicly announced on March 5, 2021.

77.     On March 4, 2021, at 10:13 a.m. ET Sanchez began buying NCLH puts in

Gonzalez's Tastyworks account as follows:

| Trade Date | Number of Contracts | Put Expiration / Strike Price | Price per Contract (x100 Shares) |
|---|---|---|---|
| 3/4/2021 | 30 | March 5, 2021 / $31.50 | $0.57 |
| 3/4/2021 | 15 | March 5, 2021 / $31.50 | $0.40 |
| 3/4/2021 | 25 | March 5, 2021 / $31.50 | $0.26 |
| 3/4/2021 | 20 | March 5, 2021 / $31.50 | $0.17 |
| 3/4/2021 | 20 | March 5, 2021 / $32 | $0.34 |

78.      An issuer's announcement of an equity offering usually results in the issuer's

share price going down because the offering is dilutive to existing shareholders.  Here, on March

5, 2021, after NCLH's offering was publicly announced, the price for NCLH shares decreased by

approximately 12.31%, from $32.90 per share to $28.85 per share.  See Appendix.

79.     That day, on March 5, 2021 starting at 9:32 a.m. ET, Sanchez sold all of the

NCLH puts in the Gonzalez Tastyworks Account, obtaining illicit profits of approximately

$15,464.  See Appendix.

80.     Between January 13, 2021 and May 21, 2021, Sanchez obtained approximately

$207,993 in illicit profits trading based on material, nonpublic information regarding at least

thirteen Deals in the Gonzalez Tastyworks Account. See Appendix.

### 4. **The Abellan Interactive Brokers Account**

81.     On March 18, 2021, an application was submitted to Interactive Brokers to open an account in Abellan's name.  Interactive Brokers approved and opened the account that same day.

82.     From March 24, 2021 through May 26, 2021, Sanchez placed trades based on material, nonpublic information regarding at least ten Deals through the Abellan Interactive Brokers Account.  See Appendix.

83.     In addition to tender offers and securities offerings, like those described above, Sanchez also traded in advance of numerous mergers and acquisitions involving SPACs in connection with his scheme.  See Appendix.

84.     Between April 9 and April 30, 2021, Sanchez accessed the Confidential Database to input and/or view information regarding the potential merger through which the SPAC Montes Archimedes Acquisition Corp. ("MAAC") acquired Roivant Sciences Ltd., which was publicly announced on May 3, 2021.  Specifically, at 9:35 a.m. ET on April 9, 2021, Sanchez accessed information in the Confidential Database regarding the MAAC transaction.  Later that day, at 3:07 p.m. ET, Sanchez began buying MAAC stock in the Abellan Interactive Brokers Account.

85.     Between April 9, 2021 and April 28, 2021, Sanchez bought a total of 1,000 shares of MAAC stock in the Abellan Interactive Brokers Account as follows:

| Trade Date | Number of Shares | Price per Share |
|---|---|---|
| 4/9/2021 | 400 | $9.85 |
| 4/14/2021 | 200 | $9.91 |
| 4/28/2021 | 400 | $9.85 |

86.     Sanchez also bought MAAC warrants in the Abellan Interactive Brokers Account. Specifically, on April 28, 2021, Sanchez bought a total of 2,000 MAAC warrants at $0.91 per warrant.

87.     On May 3, 2021, the day the MAAC transaction was publicly announced, the price for MAAC shares increased 0.91%, from $9.86 per share to $9.95 per share, and Sanchez sold all of the MAAC shares and warrants in the Abellan Interactive Brokers Account, obtaining illicit profits of approximately $1,093.  See Appendix.

88.     Between March 24, 2021 through May 26, 2021, Sanchez obtained approximately $76,630 in illicit profits trading based on material, nonpublic information regarding at least ten different Deals in the Abellan Interactive Brokers Account.  See Appendix.

**D.      Sanchez Withdraws Illegal Profits from the Abellan Interactive Brokers Account**

89.     On or about May 26, 2021, the Investment Bank interviewed Sanchez regarding certain suspicious activity.

90.     On or about May 27, 2021, Sanchez resigned from the Investment Bank.

91.     On May 28, 2021, Sanchez made a request, or caused a request to be made, to Interactive Brokers to withdraw assets from the Abellan Interactive Brokers Account.  Between June 17 and July 13, 2021, all of the assets in the account were liquidated and approximately 50,300 Euros were transferred to a bank account in Spain.

92.     As of September 23, 2021, there was approximately $68,565 in holdings in the Abellan Schwab Account, and as of September 23, 2021, there was approximately $261,337 in cash and securities in the Gonzalez Tastyworks Account.

## DEFENDANT VIOLATED THE FEDERAL SECURITIES LAWS

93.     Sanchez placed trades in the Nominal Brokerage Accounts as alleged above, based on material, nonpublic information about significant corporate events that he obtained and was entrusted with through his employment at the Investment Bank.  As detailed above and in the Appendix, Sanchez traded in brokerage accounts in the names of his mother and father based upon material, nonpublic information that he obtained through his work at the Investment Bank in violation of his duties to the Investment Bank and/or the shareholders of the entities that the Investment Bank advised.

94.     In each of the transactions described above and identified in the attached Appendix, Sanchez owed a fiduciary duty or a duty arising out of a similar relationship of trust and confidence to the Investment Bank.  With respect to the transactions where Sanchez traded the securities of entities that were clients of the Investment Bank, Sanchez also owed a fiduciary duty or a duty arising out of a similar relationship of trust and confidence to the shareholders of those entities.

95.     Sanchez knew or was reckless in not knowing that the information he possessed through his work at the Investment Bank regarding significant corporate events was material and nonpublic.  Sanchez knew or was reckless in not knowing that he violated his duties to the Investment Bank, and the shareholders of the entities the Investment Bank advised, when he used the material, nonpublic information for personal gain and trading purposes.

96.     A reasonable investor would have viewed the information relating to mergers, acquisitions, tender offers, and other significant corporate events, which Sanchez obtained through his work at the Investment Bank, and each component thereof, as being important to his or her investment decision.

24

97.     Sanchez "sold to open" (wrote) puts in the Gonzalez Interactive Brokers Account in connection with two of the Deals based on material, nonpublic information:  (1) Covis Group's tender offer to acquire AMAG, which is discussed above; and (2) Equitable Holdings, Inc.'s ("EQH") announcement after the close of the market on October 27, 2020 that it entered into an agreement with Venerable Holdings, Inc. to reinsure legacy variable annuity polices sold between 2006 and 2008 (collectively, the "Sold to Open Deals").  See Appendix.

98.     As reflected in the Appendix, Sanchez placed trades in the Gonzalez Interactive Brokers Account and the Abellan Schwab Account based on material, nonpublic information concerning potential tender offers in connection with the following companies:  AMAG Pharmaceuticals; HD Supply Holdings, Inc.; and Viela Bio, Inc. (collectively, the "Tender Offer Companies").  See Appendix.

99.     In each of these cases, Sanchez traded in the Tender Offer Companies after substantial steps had been taken to commence tender offers, including the negotiation of the tender offer transaction, the engagement of the Investment Bank to provide financial services, entering into a confidentiality agreement, conducting due diligence, and negotiating the price of the tender offer, and discussing the proposed combination at board of directors meetings. Sanchez knew, was reckless in not knowing, or had reason to know that the material information about the tender offers was nonpublic and had been acquired directly or indirectly from the offering persons, the issuers of the securities sought by the tender offers, or persons acting on behalf of the offering persons or such issuers.

## FIRST CLAIM FOR RELIEF

*Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder*

100.     The Commission re-alleges and incorporates by reference Paragraphs 1 through 99 above as if they were fully set forth herein.

25

101.    By engaging in the conduct described above, including the trading in connection with all 45 Deals identified in the Appendix, Sanchez, directly or indirectly, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, or of the mails, with scienter:

   (a) employed devices, schemes, or artifices to defraud;

   (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and

   (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, including purchasers and sellers of securities.

102.    By reason of the actions alleged herein, Sanchez violated and, unless restrained and enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## SECOND CLAIM FOR RELIEF

*Violations of Section 17(a) of the Securities Act*

103.    The Commission re-alleges and incorporates by reference Paragraphs 1 through 102 above as if they were fully set forth herein.

104.    Defendant Sanchez, in the offer or sale of securities in the Sold to Open Deals, has:

   (a) employed devices, schemes or artifices to defraud;

   (b) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

   (c) engaged in acts, practices and courses of business which operate as a fraud or deceit upon purchasers, prospective purchasers, and other persons.

105.     By reason of the foregoing, Defendant Sanchez violated, and unless enjoined, will continue to violate Section 17(a) of the Securities Act [15 U.S.C. § 77q].

### THIRD CLAIM FOR RELIEF

*Violations of Section 14(e) of the Exchange Act and Rule 14e-3 Thereunder*

106.     The Commission realleges and incorporates by reference paragraphs 1 through 105 above.

107.     Sanchez possessed material, nonpublic information about contemplated tender offer transactions that he obtained from his work at the Investment Bank.

108.     Sanchez knew, was reckless in not knowing, or had reason to know that this information was nonpublic, and that he had acquired it, directly or indirectly, from the offering person, the issuer of the securities sought or to be sought by such tender offer, and/or any officer, director, partner, employee, or other person acting on behalf of either the offering person or the issuer.

109.     Sanchez directly or indirectly, traded, directed, or caused others to trade in securities of the Tender Offer Companies after substantial steps had been taken to commence tender offers for the shares of these companies and before the tender offers had been publicly announced.

110.     By engaging in the foregoing conduct Sanchez violated, and unless enjoined will continue to violate, Section 14(e) of the Exchange Act [15 U.S.C. § 78n(e)], and Rule 14e-3 thereunder [17 C.F.R. § 240.14e-3].

### FOURTH CLAIM FOR RELIEF

*Claims with Respect to Relief Defendants Abellan and Gonzalez*

111.     The Commission realleges and incorporates by reference paragraphs 1 through 110 above.

27

112.    Sanchez generated illicit profits of approximately $154,828 in accounts held in the name of Abellan, to which Abellan does not have any legitimate claim, as set forth above and in the Appendix.

113.    Sanchez generated illicit profits of approximately $316,897 in accounts held in the name of Gonzalez, to which Gonzalez does not have any legitimate claim, as set forth above and in the Appendix.

114.    Abellan and Gonzalez received these ill-gotten gains described above as part, and in furtherance of, the securities violations alleged above, under circumstances in which it is not just, equitable, or conscionable for them to retain the funds.

115.    By reason of the foregoing, Abellan and Gonzalez have been unjustly enriched and must disgorge, collectively, the approximately $471,725of ill-gotten gains.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court enter a judgment:

### I.

Finding that Defendant Sanchez violated Section 17(a) of the Securities Act [15 U.S.C. § 77q], and Sections 10(b) and 14(e) of the Exchange Act [15 U.S.C. §§ 78j(b), 78n(e)] and Rules 10b-5 and 14e-3 thereunder [17 C.F.R. §§ 240.10b-5, 240.14e-3];

### II.

Permanently restraining and enjoining Defendant Sanchez from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q], and Sections 10(b) and 14(e) of the Exchange Act [15 U.S.C. §§ 78j(b), 78n(e)] and Rules 10b-5 and 14e-3 thereunder [17 C.F.R. §§ 240.10b-5, 240.14e-3];

### III.

Ordering Defendant Sanchez to disgorge all ill-gotten gains, plus prejudgment interest;

IV.

Ordering Defendant Sanchez to pay civil monetary penalties pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-l];

V.

Ordering the Relief Defendants, Abellan and Gonzalez, to disgorge all ill-gotten gains or unjust enrichment derived from the activities set forth in this Complaint;

VI.

Retaining jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered; and

VII.

Granting such other and further relief as this Court may determine to be just and appropriate.


Dated:  September 29, 2021

By:    /s/ Assunta Vivolo
Joseph G. Sansone
Assunta Vivolo
NY 4213153
David W. Snyder*
Christopher M. Colorado
U.S. Securities and Exchange Commission
Philadelphia Regional Office
1617 JFK Boulevard, Suite 520
Philadelphia, PA 19103
(215) 597-1047 (Vivolo)
vivoloa@sec.gov

*Not admitted in the S.D.N.Y.