UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br><br>        Plaintiff,<br><br>   v.<br><br>JOSE LUIS CASERO SANCHEZ,<br><br>        Defendant,<br><br>   and<br><br>JOSE LUIS CASERO ABELLAN, and MARIA ISABEL SANCHEZ GONZALEZ,<br><br>        Relief Defendants. | Civil Action No. 21-CV-8085 |

PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S
MEMORANDUM OF LAW IN SUPPORT OF ITS APPLICATION FOR
DEFAULT JUDGMENT AGAINST JOSE LUIS CASERO SANCHEZ

Joseph G. Sansone
Assunta Vivolo
David W. Snyder (admitted *pro hac vice*)
Christopher M. Colorado
Counsel for the Plaintiff
U.S. Securities and Exchange Commission
Philadelphia Regional Office
1617 JFK Boulevard, Suite 520
Philadelphia, Pennsylvania 19103
(215) 597-1047 (Vivolo)

March 1, 2022

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................................. i

TABLE OF AUTHORITIES ....................................................................................................... iii

BACKGROUND ............................................................................................................................ 1

I.      THE COMMISSION'S COMPLAINT ............................................................................. 1

        A.      In Sanchez's Role as Compliance Analyst, He Had Access to
                Material, Nonpublic Information ................................................................... 1

        B.      The Investment Bank's Policies and Procedures Barred Sanchez
                From Using Material, Nonpublic Information For His Own Benefit .................... 2

        C.      Sanchez Traded Based on Material, Nonpublic Information ................................. 3

        D.      Sanchez Concealed His Trading From the Investment Bank, and
                Then Resigned His Position as Compliance Analyst .............................................. 9

II.     PROCEDURAL BACKGROUND ..................................................................................... 9

ARGUMENT ............................................................................................................................... 11

I.      DEFAULT JUDGMENT STANDARD ......................................................................... 11

II.     SANCHEZ IS IN DEFAULT ......................................................................................... 13

III.    THE COMPLAINT ESTABLISHES SANCHEZ'S LIABILITY ................................. 13

        A.      Sanchez Violated Section 17(a) of the Securities Act,
                Section 10(b) of the Exchange Act, and Exchange Act Rule 10b-5 .................... 13

                1.      Sanchez Obtained Material and Non-Public Information ........................ 14

                2.      Sanchez Misappropriated or Misused the Information
                        by Trading on It ........................................................................................ 15

                3.      Sanchez Breached Duties of Trust and Confidence
                        That He Owed to the Investment Bank and Its Clients ............................ 16

                4.      Sanchez Acted With Scienter .................................................................... 18

        B.      Sanchez Violated Section 14(e) of the Exchange Act
                and Rule 14e-3 Thereunder ....................................................................................... 20

IV.    THE COURT SHOULD GRANT THE RELIEF SOUGHT............................................. 22

    A.    Sanchez Should be Enjoined from Future Violations of the Securities Laws ...... 22

    B.    The Court Should Order Sanchez to Pay
        Disgorgement and Pre-Judgment Interest............................................................ 23

    C.    The Court Should Enter the Maximum Civil Penalty against Sanchez................ 24

    D.    Frozen Assets Should be Paid to the Commission
        in Partial Satisfaction of the Requested Judgment................................................ 25

CONCLUSION.................................................................................................................... 26

# TABLE OF AUTHORITIES

**CASES**                                                                                          **Page(s)**

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)................................................................................................12

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 544 (2007)................................................................................................12

*Chiarella v. United States,*
    445 U.S. 222 (1980)................................................................................................14

*Daniello v. Planned System Integration,*
    No. 07-cv-1729 (RRM), 2009 WL 2160536 (E.D.N.Y. July 17, 2009)............................12

*Dirks v. SEC,*
    463 U.S. 646 (1983)...........................................................................................14, 17

*Ernst & Ernst v. Hochfelder,*
    425 U.S. 185 (1976)................................................................................................18

*Herman & MacLean v. Huddleston,*
    459 U.S. 375 (1983)................................................................................................19

*Rolf v. Blyth, Eastman Dillon & Co.,*
    570 F.2d 38 (2d Cir. 1978)......................................................................................18

*SEC v. Aly,* 2018 WL 4853031,
    No. 16-cv-3853 (PGG), (S.D.N.Y. Oct. 5, 2018) ......................................................22, 23

*SEC v. Anticevic,*
    No. 05-cv-6991 (KMW), 2010 WL 2077196 (S.D.N.Y. May 14, 2010) ........................20

*SEC v. Chan,*
    465 F. Supp. 3d 18 (D. Mass. 2020) ........................................................................24

*SEC v. Commonwealth Chem. Sec., Inc.,*
    574 F.2d 90 (2d Cir. 1978).......................................................................................22

*SEC v. Cope,*
    No. 14-cv-7575 (DLC), 2021 WL 653088 (S.D.N.Y. Feb. 19, 2021)..............................23

*SEC v. Cuban,*
    620 F.3d 551 (5th Cir. 2010) ..................................................................................17

*SEC v. Dang,*
    No. 20-cv-01353 (JAM), 2021 WL 1550593 (D. Conn. Apr. 19, 2021)...........................24

*SEC v. First Jersey Sec., Inc.*,
 101 F.3d 1450 (2d Cir. 1996)............................................................................14, 24

*SEC v. Fowler*,
 440 F. Supp. 3d 284 (S.D.N.Y. 2020)..............................................................22

*SEC v. Gonzalez de Castilla*,
 145 F. Supp. 2d 402 (S.D.N.Y. 2001)................................................14, 15, 17

*SEC v. Kinnucan*,
 9 F. Supp. 3d 370 (S.D.N.Y. 2014)............................................................24, 25

*SEC v. Lyon*,
 529 F. Supp. 2d 444 (S.D.N.Y. 2008)............................................................13, 15

*SEC v. Manor Nursing Centers, Inc.*,
 458 F.2d 1082 (2d Cir. 1972)..........................................................................22

*SEC v. Materia*,
 745 F.2d 197 (2d Cir. 1984).............................................................................15

*SEC v. Mayhew*,
 121 F.3d 44 (2d Cir. 1997)...............................................................................21

*SEC v. Musella*,
 578 F. Supp. 425 (S.D.N.Y. 1984)..................................................................21

*SEC v. Obus*,
 693 F.3d 276 (2d Cir. 2012)................................................................... 13, 15-17

*SEC v. One or More Unknown Traders in the Common Stock of Certain Issuers*,
 No. 08-cv-1402 (KAM), 2009 WL 3233110 (E.D.N.Y. Oct. 2, 2009) ...........................23

*SEC v. Rajaratnam*,
 822 F. Supp. 2d 432 (S.D.N.Y. 2011)...................................................... 24-25

*SEC v. Rinfret*,
 No. 19-cv-6037 (AJN), 2020 WL 6559411 (S.D.N.Y. Nov. 9, 2020).......................... 11-12

*SEC v. Rosenthal*,
 650 F.3d 156 (2d Cir. 2011).............................................................................24

*SEC v. Rust*,
 No. 16-cv-3573 (ER), 2021 WL 2850615 (S.D.N.Y. July 8, 2021)........................... 23-24

*SEC v. Sargent*,
 229 F.3d 68 (1st Cir. 2000)...............................................................................20

*SEC v. Singer*,
786 F. Supp. 1158 (S.D.N.Y. 1992)......................................................................19

*SEC v. Skelley*,
No. 18-cv-08803 (LGS) (DF), 2021 WL 863298 (S.D.N.Y. Feb. 25, 2021) ..................12

*SEC v. Skelley*,
No. 18-cv-08803 (LGS), 2021 WL 1164594 (S.D.N.Y. Mar. 26, 2021).........................12

*SEC v. Warde*,
151 F.3d 42, (2d Cir. 1998)..........................................................................16

*Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
495 F.2d 228 (2d Cir. 1974)........................................................................15

*Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp.*,
109 F.3d 105 (2d Cir. 1997)........................................................................12

*U.S. v. Chestman*,
947 F.2d 551 (2d Cir. 1991)........................................................................20

*United States v. Larrabee*,
240 F.3d 18 (1st Cir. 2001)........................................................................16

*United States v. Newman*,
664 F.2d 12 (2d Cir. 1981)........................................................................14

*United States v. O'Hagan*,
521 U.S. 642 (1997)..............................................................................17

*United States v. Whitman*,
904 F. Supp. 2d 363 (S.D.N.Y. 2012)........................................................16, 17

*Unknown Traders in Sec. of the Onyx Pharm.*, Inc.,
No. 13-cv-4645 (JPO), 2014 WL 5026153 (S.D.N.Y. Sept. 29, 2014) ..........................16

## STATUTES, RULES, AND OTHER AUTHORITIES

15 U.S.C. § 77q..................................................................................1, 13

15 U.S.C. § 78j(b)..............................................................................1, 13

15 U.S.C. §78n(e)...............................................................................1, 20

15 U.S.C. § 78u(d)............................................................................12, 22

15 U.S.C. § 78u-1(a)(1)..........................................................................24

15 U.S.C. § 78u-1(a)(2)..........................................................................24

v

17 C.F.R. § 240.10b-5...........................................................................................1, 13, 15

17 C.F.R. § 240.14e-3...........................................................................................1, 20, 21

Federal Rule of Civil Procedure 4(f)(3)............................................................................13

Federal Rule of Civil Procedure 12(a)(1) ........................................................................13

Federal Rule of Civil Procedure 55(b)(2) .....................................................................1, 12

Pursuant to Federal Rule of Civil Procedure 55(b)(2), Local Rule 55.2(b), and Section 3 of this Court's Individual Practices, Plaintiff United States Securities and Exchange Commission ("Commission") moves the court for a final judgment against defendant Jose Luis Casero Sanchez ("Sanchez").  Sanchez has been served with process, but has failed to appear in this action and to answer or otherwise respond to the Complaint.  The Complaint's well-pleaded allegations establish Sanchez's repeated and unlawful insider trading in violation of Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q], Sections 10(b) and 14(e) of the Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b), 78n(e)], and Rules 10b-5 and 14e-3 thereunder [17 C.F.R. §§ 240.10b-5, 240.14e-3].  Sanchez should not be permitted to avoid the consequences of his fraudulent conduct by simply ignoring this lawsuit.  Thus, a default judgment is appropriate to allow the Commission to obtain injunctive relief to prohibit future securities law violations and to resolve the Commission's claims for monetary relief in the form of disgorgement and a civil penalty.

## BACKGROUND

### I.      THE COMMISSION'S COMPLAINT

On September 29, 2021, the Commission filed a Complaint alleging that Sanchez used confidential non-public information—obtained from his former employer, a prominent United States-based investment bank ("Investment Bank")—to engage in securities fraud by trading in front of 45 transactions advised by or otherwise involving the Investment Bank, ultimately obtaining hundreds of thousands of dollars in illicit trading profits.  (Dkt. No. 9 ("Compl.").)  The Complaint's allegations against Sanchez are summarized below.

### A.      In Sanchez's Role as Compliance Analyst, He Had Access to Material, Nonpublic Information

Sanchez is a Spanish national who, from September 2019 to May 2021, was a Senior Analyst in the Investment Bank's Compliance Division, working from Poland.  (Compl. ¶¶ 8, 19.)

In that role, the Investment Bank provided Sanchez with access to an internal Investment Bank database ("Confidential Database") that tracked material and confidential details regarding all potential upcoming mergers, acquisitions, and financings in which the Investment Bank was advising clients or otherwise involved.  (*Id*. ¶¶ 19, 30-36.)  For each such transaction, the Confidential Database included, among other things, the names of the entities involved in the potential or pending transaction, the Investment Bank's role in the transaction, the nature of the transaction, the securities involved, the type of financing involved, the size of the transaction, pricing information, and the projected public announcement date.  (*Id.* ¶ 34.)  Sanchez routinely accessed the Confidential Database, including to track and update the flow of this material, non-public information within the Investment Bank and to assist the Investment Bank's efforts to prevent employees from trading on this information.  (*Id.* ¶¶ 31, 35-36.)

### B.      The Investment Bank's Policies and Procedures Barred Sanchez From Using Material, Nonpublic Information For His Own Benefit

Sanchez was well-aware that the Investment Bank's policies and procedures required that nonpublic information about the firm's clients—such as the information maintained in the Confidential Database—be kept confidential, and that Sanchez was prohibited from using such information for his personal benefit.  (*Id.* ¶¶ 20-29.)  Indeed, Sanchez's employment agreement made that requirement and prohibition explicit (*id.* ¶¶ 21-22), as did the multiple "Insider Trading" and "Compliance" trainings that Sanchez attended and the annual "Personal Trading" policies that Sanchez reviewed and signed, (*id.* ¶¶ 23-24, 27-29).  Additionally, Sanchez knew that before effecting any personal securities transaction, he was required to pre-clear the transaction with the Investment Bank, a process that would have required Sanchez to certify that he was "not aware of material, non-public information regarding the Financial Instrument" for which he sought permission to trade.  (*Id.* ¶¶ 25-26, 29.)

### C.      Sanchez Traded Based on Material, Nonpublic Information

Notwithstanding the Investment Bank's requirements and prohibitions concerning confidential client information, between September 2020 and March 2021, Sanchez used material, nonpublic information from the Confidential Database to profitably trade in the securities of 45 public issuers in advance of 45 material transactions announced by those entities, including mergers and acquisitions, tender offers, SPAC deals, and equity financings ("Investment Bank Deals"). (*Id.* ¶¶ 37, 40; *see also* Declaration of John S. Rymas, dated March 1, 2022, filed herewith ("Rymas Decl."), ¶¶ 9-15 & Exh. A.[1])  In each case, the Investment Bank was advising one of the parties to the transaction, and the Confidential Database contained material, nonpublic information concerning, among other things, the entities involved, the nature of the transaction, and the date on which the transaction would be publicly announced.  (Compl. ¶¶ 37, 40.)  And, in each case—as shown by access logs from the Confidential Database—before effecting his trades, Sanchez accessed the Confidential Database information regarding the respective Investment Bank Deal and entities involved.  (*Id.* ¶¶ 36, 40; Rymas Decl. ¶¶ 10, 13.)  Only after accessing that confidential information, did Sanchez effect his trades in four brokerage accounts that were nominally held in his parents' names—Maria Isabel Sanchez Gonzalez ("Gonzalez") and Jose Luis Casero Abellan ("Abellan," together with Gonzalez, "Relief Defendants"))—but which accounts Sanchez controlled.[2]  (Compl. ¶¶ 40-44.)

Gonzalez and Abellan have each stipulated that Sanchez controlled each of those accounts, and have released any interest they have in those accounts.  *See* Stipulation and Proposed Order as

---

[1] Although the body of the Complaint details Sanchez's unlawful trading, certain paragraphs of the Complaint also reference an "Appendix" with supplementary detail regarding that trading.  *See, e.g.*, Compl. ¶ 37.  The Complaint and Appendix were each served on Defendant Sanchez when the Complaint was filed on September 29, 2021 (Dkt. No. 22 at ¶ 9(b); *see also* Declaration of David W. Snyder, dated March 1, 2022 ("Snyder Decl.") at ¶ 24 & Exh. A, filed herewith); however, the

to Relief Defendant Jose Luis Casero Abellan ("Abellan Proposed Order and Stip."), at 2-3, and

Stipulation and Proposed Order as to Relief Defendant Maria Isabel Sanchez Gonzalez ("Gonzalez

Proposed Order and Stip."), at 2 (each of which is filed concurrently with the instant motion).

### 1. *Sanchez's Trading in the Gonzalez Interactive Brokers Account*

Sanchez's insider trading scheme began in a brokerage account at Interactive Brokers LLC

("Interactive Brokers") nominally held by Sanchez's mother ("Gonzalez Interactive Brokers

Account"). Sanchez facilitated the opening of, and controlled trading in, the Gonzalez Interactive

Brokers Account. (*Id.* ¶¶ 42-48; *see also* Gonzalez Proposed Order and Stip. at 2 (Gonzalez

stipulating that Sanchez controlled the Gonzalez Interactive Brokers Account).) In that account,

between September 9, 2020 and November 20, 2020, Sanchez traded based on material, nonpublic

information in the securities of 12 entities in advance of 12 Investment Bank Deals involving those

entities. (Compl. ¶ 49; Rymas Decl., Exh. A (rows 1-12).) In each case, before he traded, Sanchez

accessed material, nonpublic information about the respective Investment Bank Deal in the

Confidential Database. (*Id.* ¶¶ 36, 40, 49; Rymas Decl. ¶¶ 10, 13.)

For example, on September 23, 2020, at 9:40 a.m. ET, Sanchez accessed the Confidential

Database to access or input nonpublic information regarding Covis Group S.à.r.l.'s ("Covis Group")

proposed tender offer to acquire one of the Investment Bank's clients, AMAG Pharmaceuticals, Inc.

---

PACER-filed version of the Complaint inadvertently omitted that Appendix. Contemporaneous to filing its Complaint, the Commission filed the Appendix as Exhibit 4 to the Declaration of John S. Rymas, dated September 29, 2021—which was also served on Defendant Sanchez. *See* Dkt. Nos. 14 & 14-4; Dkt No. 22 at ¶ 9(b). Additionally, in support of the instant motion, the Commission has filed the Appendix—with additional information regarding the calculation of prejudgment interest— as Exhibit A to the Rymas Declaration, dated March 1, 2022.

[2] Because Sanchez effected his unlawful trading scheme in brokerage accounts nominally held by his parents, Gonzalez and Abellan, and because a portion of Sanchez's illicit trading profits were held in those brokerage accounts—despite that his parents had no legitimate claim to those illicit profits—the Complaint also named his parents as relief defendants. *See* Compl. ¶¶ 9-10, 112-115.

("AMAG").  (Compl. ¶ 50.)  Later that same day and continuing through September 30, 2020, Sanchez repeatedly accessed the Gonzalez Interactive Brokers Account to trade in AMAG securities, purchasing 100 AMAG call options and selling 20 AMAG put options (also referred to as "writing" put options)—all of which were bets that AMAG's stock price would increase in the near future. [3]  (*Id.* ¶¶ 51-54.)  By the time of Sanchez's first AMAG share purchase on September 23, Covis Group and AMAG had already taken substantial steps to complete the tender offer.  (*Id.* ¶ 52.)  When Sanchez made his AMAG trades, AMAG's shares were trading between approximately $8.62 and $9.39 per share.  (*Id.* ¶ 53.)  On October 1, 2020, Covis Group publicly announced that it was commencing a tender offer for all AMAG outstanding shares at $13.75 per share, (*id.* ¶ 55), and AMAG's share price increased by more than 45% to $13.65 per share.  (*Id.*)  After the announcement, Sanchez sold his 100 AMAG call options and, together with the premiums he had received from writing the AMAG put options, Sanchez obtained illegal trading profits of $36,694.23.  (*Id.* ¶ 56; Rymas Decl., Exh. A (row 7).)

In total, by trading on material, nonpublic information in the Gonzalez Interactive Brokers Account in front of 12 Investment Bank Deals, Sanchez obtained at least $108,904.13 in illicit profits.  (Compl. ¶ 58; Rymas Decl. ¶ 14(a).)  On November 20, 2020, terminated the customer relationship associated with the Gonzalez Interactive Brokers Account.  (Compl. ¶ 59.)  The account was then liquidated and, on December 16, 2020, the account was closed.  (*Id.* ¶¶ 59-60.)

2.    *Sanchez's Trading in the Abellan Schwab Account*

On December 21, 2020—five days after Interactive Brokers closed the Gonzalez Interactive

---

[3] In a put option contract, the seller (writer) of the put option conveys to the buyer the right to sell a certain number of shares of the underlying stock (usually, 100 shares) at a certain price on or before the expiration date. Compl. ¶ 15.  In exchange for this right, the buyer pays the seller a premium for each put option contract.  *Id.*  The put option seller (writer) generally believes that the price of the underlying stock will increase, in which case the buyer's right to sell the shares will expire worthless, and the seller will profit by the amount of the premium paid.  *Id.*

Brokers Account—Sanchez applied to open a brokerage account at Charles Schwab & Co. ("Schwab") held nominally in his father's name (the "Abellan Schwab Account").  (*Id.* ¶ 61.) Sanchez also controlled the trading in the Abellan Schwab Account.  (*Id.* ¶¶ 42-44, 61; *see also* Abellan Stip. and Proposed Order at 2 (Abellan stipulating that Sanchez controlled the Abellan Schwab Account).)  In that account, between January 11, 2021 and May 26, 2021, Sanchez traded based on material, nonpublic information in the securities of 20 entities in advance of 20 Investment Bank Deals involving those entities.  (Compl. ¶ 63; *see also* Rymas Decl., Exh. A (rows 13 to 15, 19-20, 23, 25-28, 31-32, 34, 36-37, 39, 41, 43-45).)  In each case, before trading, Sanchez accessed material, nonpublic information about the respective Investment Bank Deal in the Confidential Database.  (Compl. ¶¶ 36, 40, 64; Rymas Decl. ¶¶ 10, 13.)

For example, between December 4 and December 18, 2020, Sanchez repeatedly accessed the Confidential Database to review or input nonpublic information regarding Horizon Therapeutics plc's ("Horizon Therapeutics") proposed tender offer to acquire the Investment Bank's client, Viela Bio, Inc. ("VIE").  (Compl. ¶ 64.)  On January 13, 2021, Sanchez purchased 200 VIE shares in the Abellan Schwab Account at $36.25 per share, and on January 22, 2021, Sanchez purchased an additional 200 VIE shares in that account at $34.40 per share.  (*Id.* ¶ 65.)  On February 1, 2021, Horizon Therapeutics publicly announced that it was commencing a tender offer for all of VIE's outstanding shares at $53.00 per share and, on this announcement, VIE's share price increased by more than 52%.  (*Id.* ¶ 67.)  Hours after the announcement on February 1, Sanchez sold all 400 shares in the Abellan Schwab Account, obtaining illegal trading profits of $7,009.53.  (*Id.*; Rymas Decl., Exh. A (row 20).)

In total, by trading on material, nonpublic information in the Abellan Schwab Account in front of 20 Investment Bank Deals, Sanchez obtained illicit trading profits of at least $78,197.89. (Compl. ¶ 68; Rymas Decl. ¶ 14(b).)

3.    *Sanchez's Trading in the Gonzalez Tastyworks Account*

On December 26, 2020—five days after applying to open the Abellan Schwab Account—Sanchez also applied to open a brokerage account at Tastyworks, Inc. ("Tastyworks") to be nominally held in his mother's name ("Gonzalez Tastyworks Account").  (Compl. ¶ 69.)  Sanchez controlled trading in the Gonzalez Tastyworks Account.  (*Id.* ¶¶ 70-71; *see also* Gonzalez Stip. and Proposed Order at 2 (Gonzalez stipulating that Sanchez controlled the Gonzalez Tastyworks Account).)  In that account, between January 13 and May 21, 2021, Sanchez traded based on material, nonpublic information in the securities of 13 entities in advance of 13 Investment Bank Deals involving those entities.  (Compl. ¶ 72; *see also* Rymas Decl., Exh. A (rows 16-18, 21-22, 24, 29-30, 33, 35, 38, 40, 42).)  In each case, before he traded, Sanchez accessed material, nonpublic information about the respective Investment Bank Deal in the Confidential Database.  (Compl. ¶¶ 36, 40, 73, 76; *see also* Rymas Decl. ¶¶ 10, 13.)

For example, on March 4, 2021, Sanchez accessed the Confidential Database concerning Norwegian Cruise Line Holdings Ltd.'s ("NCLH") upcoming equity offering, in which the Investment Bank was the underwriter.  (Compl. ¶ 76.)  Later that day, Sanchez accessed the Gonzalez Tastyworks Account and began buying NCLH put options, purchasing 110 put options over the course of the day.  (*Id.* ¶ 77.)  Sanchez was anticipating that NCLH's share price would decrease upon its announcement of the offering due to the dilutive effect on existing shareholders.  (*Id.* ¶ 78.)  On March 5, NCLH announced its equity offering and NCLH's share price decreased by more than 12%, from $32.90 per share to $28.85 per share.  (*Id.*)  Sanchez then sold all of his NCLH put options, obtaining illegal profits of $15,464.83.  (*Id.* ¶ 79; Rymas Decl., Exh. A (row 30).)

In total, by trading on material, nonpublic information in the Gonzalez Tastyworks Account in front of 13 Investment Bank Deals, Sanchez obtained illicit trading profits of at least $207,993.50.  (Compl. ¶ 80; Rymas Decl. ¶ 14(c).)

4.    *Sanchez's Trading in the Abellan Interactive Brokers Account*

On March 18, 2021, an account was opened at Interactive Brokers, nominally in Sanchez's father's name ("Abellan Interactive Brokers Account"), which Sanchez also controlled.  (Compl. ¶¶ 42-44, 81; *see also* Abellan Stip. and Proposed Order at 3 (Abellan stipulating that Sanchez controlled the Abellan Interactive Brokers Account).)  In that account, between March 24, 2021 and May 26, 2021, Sanchez traded based on material, nonpublic information in the securities of 10 entities in advance of 10 Investment Bank Deals involving those entities.  (Compl. ¶ 82; *see also* Rymas Decl. Exh. A (rows 36-45).)  Again, in each case, before he traded, Sanchez accessed material, nonpublic information about the respective Investment Bank Deal in the Confidential Database.  (Compl. ¶¶ 36, 40, 84; Rymas Decl. ¶¶ 10, 13.)

For example, on April 9, 2021, Sanchez accessed the Confidential Database to access or input nonpublic information regarding the proposed acquisition of an Investment Bank client, Roviant Sciences Ltd. ("Roviant"), by a SPAC, Montes Archimedes Acquisition Corp. ("MAAC").  (Compl. ¶ 84.)  Later that day, Sanchez began buying MAAC stock in the Abellan Interactive Brokers Account, and between April 9 and April 28, 2021 (during which time he continued to access the Confidential Database regarding the MAAC-Roviant deal), Sanchez purchased 1,000 MAAC shares.  (*Id.* ¶ 85.)  On April 28, 2021, Sanchez also purchased 2,000 MAAC warrants.  (*Id.* ¶ 86.)  On May 3, 2021, MAAC announced its transaction with Roviant, and the price for its shares increased from $9.86 per share to $9.95 per share.  (*Id.* ¶ 87.)  That day, after the announcement, Sanchez sold all of the MAAC shares and warrants in the Abellan Interactive Brokers Account, and obtained illegal profits of $1,093.52.  (*Id.*; *see also* Rymas Decl., Exh. A (row 41).)

In total, by trading on material, nonpublic information in the Abellan Interactive Brokers Account in front of 10 Investment Bank Deals, Sanchez obtained illicit trading profits of at least $76,630.13.  (Compl. ¶ 88; Rymas Decl. ¶ 14(d).)

### D.     Sanchez Concealed His Trading From the Investment Bank, and Then Resigned His Position as Compliance Analyst

Despite the Investment Bank's policies requiring Sanchez to disclose to the Investment Bank all brokerage accounts with respect to which he had any control, interest, discretion, or influence, Sanchez never disclosed the existence of, or his relationship to, any of the four brokerage accounts described above that he controlled.  (Compl. ¶¶ 25-26.)  Nor did Sanchez comply with the Investment Bank's requirement that he seek and obtain pre-clearance to place any of his securities trades, which would have required him to affirm that he did not have material, nonpublic information regarding the securities at issue (*id.* ¶ 25)—something he could not do.

On May 26, 2021, the Investment Bank interviewed Sanchez regarding certain suspicious activity and the next day, May 27, he resigned.  (*Id.* ¶¶ 89-90.)  Between May 28, 2021 and July 13, 2021, Sanchez liquidated and transferred all of the assets in the Abellan Interactive Brokers Account.  (*Id.* ¶ 91.)  At the time this action was filed, the Abellan Schwab Account and the Gonzalez Tastyworks Account remained open and each contained proceeds from Sanchez's illicit trading.  (*Id.* ¶ 92.)

## II.     PROCEDURAL BACKGROUND

On September 29, 2021, the Commission filed the Complaint in this matter.  (Dkt. No. 9.) That day, the Court granted the Commission's motion for a temporary restraining order against Sanchez and the Relief Defendants, freezing assets, and granting other relief ("September 29 Order").  (Dkt. No. 20.)  Also that day, the Commission served Sanchez and the Relief Defendants with the September 29 Order, along with the pleadings and supporting papers.  (Dkt. No. 22.)  On October 5, 2021, after the Summons was issued, the Commission served Sanchez and the Relief Defendants with the Summons and Complaint.  (Dkt. No. 34.)  On October 14, 2021, the Court

granted the Commission's request for a preliminary injunction that, *inter alia*, extended the asset freeze pending a final resolution of this matter ("October 14 Order").  (Dkt. No. 28.)

Pursuant to the September 29 Order and the October 14 Order, Schwab has frozen approximately $65,224.17 in cash in the Abellan Schwab Account and Tastyworks has frozen approximately $319,469.34 in cash and securities in the Gonzalez Tastyworks Account.  (*See* Snyder Decl. ¶ 22.)  Also pursuant to those Orders, Bitstamp USA Inc. ("Bitstamp"), a digital asset exchange, has frozen approximately €23,978.99 in an account in Sanchez's name ("Sanchez Bitstamp Account").[4]  (*Id.*)  And, pursuant to those Orders, Wise US, Inc. ("Wise"), a money transfer platform, has frozen €7,188.05 in an account in Sanchez's name ("Sanchez Wise Account") and €641.22 in an account in Abellan's name ("Abellan Wise Account").  (*Id.*)  In total, the dollars, securities, and euros frozen by the brokerage firms, digital asset exchange, and money transfer platform pursuant to the September 29 Order and October 14 Order are currently valued at approximately $420,334.60.

Sanchez was required to Answer or otherwise respond to the Complaint by November 4, 2021.  He has not done so.  Although Sanchez retained counsel in response to the Commission's allegations, neither Sanchez nor his counsel have appeared in this action, and they have not responded to the Commission's Complaint—and Sanchez's counsel has informed Commission staff that Sanchez does not intend to appear or answer the Complaint.  (Snyder Decl. ¶¶ 18-21.)  Based on Sanchez's failure to respond, the Clerk entered a Certificate of Default against Sanchez on December 15, 2021.  (Dkt. No. 38.)  The Commission now seeks a default judgment against

---

[4] With respect to the Sanchez Bitstamp Account, after the Court issued the September 29 Order, but before Bitstamp imposed the Court-ordered asset freeze on the Sanchez Bitstamp Account, Sanchez liquidated and transferred all assets in that account in violation of the September 29 Order.  *See* Snyder Decl. ¶ 15; *see also* Dkt. No. 25 (10/12/21 Ltr. from Commission to Judge Castel). However, following discussions between Commission staff and Sanchez's counsel, Sanchez agreed to return those funds to Bitstamp and those funds are currently frozen.  *See* Snyder Decl. ¶ 19.

Sanchez permanently enjoining him from violating the securities laws and ordering him to pay disgorgement and a civil penalty.

## ARGUMENT

The Court should enter a default judgment against Sanchez.  He has been properly served with the Summons and Complaint, but has failed to answer, plead, or otherwise defend this case, and the Clerk of Court has entered his default.  Sanchez's failure to appear and participate in this case should not prevent the Commission from obtaining relief against him.  Accordingly, the Court should enjoin Sanchez from future violations of the provisions of the federal securities laws, order him to pay disgorgement of $471,725.65, the amount of his illicit trading profits, and impose a penalty of $1,415,176.95, three times his illicit trading profits.

## I.    DEFAULT JUDGMENT STANDARD

"Federal Rule of Civil Procedure 55 sets out a two-step procedure to be followed for the entry of judgment against a party who fails to defend: the entry of a default, and the entry of a default judgment."  *SEC v. Rinfret*, 19-cv-6037 (AJN), 2020 WL 6559411, at *2 (S.D.N.Y. Nov. 9, 2020).  "The first step, entry of a default, simply formalizes a judicial recognition that a defendant has, through its failure to defend the action, admitted liability to the plaintiff."  *Id.* (internal quotations omitted).  "The second step, entry of a default judgment, converts the defendant's admission of liability into a final judgment that terminates the litigation and awards the plaintiff any relief to which the court decides it is entitled, to the extent permitted by the pleadings."  *Rinfret*, 2020 WL 6559411, at *2 (internal quotation and citation omitted).

"Whether entry of default judgment at the second step is appropriate depends upon whether the allegations against the defaulting party are well-pleaded."  *Id.* at *3.  "Once a party is in default, a district court must accept as true all of the factual allegations of the non-defaulting party and draw all reasonable inferences in its favor."  *Id.* (internal quotation marks and citations omitted).  "But

because a party in default does not admit conclusions of law, the Court must determine whether the plaintiff's allegations are sufficient to establish the defendant's liability as a matter of law." *Id.* Accordingly, to determine the "legal sufficiency" of the Commission's claims, the Court is to apply the "plausibility standard enunciated in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), aided by the additional step of drawing inferences in the [Commission's] favor." *Id.*

The Commission seeks three forms of relief against Sanchez, an injunction against future violations of the charged securities laws, disgorgement of Sanchez's illicit trading profits, and a civil monetary penalty.  To determine whether such relief is appropriate as part of a motion for default judgment—absent any counter-evidence proffered by a defendant—courts in this District likewise accept as true all of the Complaint's well-pleaded fact allegations, and also take into consideration any additional evidence the Commission proffers in support of its requested relief. *See id.* at *7; *SEC v. Skelley*, 18-cv-08803 (LGS) (DF), 2021 WL 863298, at *8-9 (S.D.N.Y. Feb. 25, 2021) (Magistrate Judge Report and Recommendation, adopted by District Court Judge on March 26, 2021, *SEC v. Skelley*, 18-cv-08803 (LGS), 2021 WL 1164594 (S.D.N.Y. Mar. 26, 2021)).  The Court need not hold a hearing, and may rely on affidavits or documentary evidence, including the declarations filed herewith.  *See, e.g.*, *Daniello v. Planned System Integration*, No. 07-cv-1729 (RRM), 2009 WL 2160536, at *4 (E.D.N.Y. July 17, 2009); *see also Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp.*, 109 F.3d 105, 111 (2d Cir. 1997) ("We have held that, under rule 55(b)(2), it [is] not necessary for the District Court to hold a hearing, as long as it ensured that there was a basis for the damages specified in the default judgment.").[5]

---

[5] The Court has subject matter and personal jurisdiction.  *See* Snyder Decl. ¶¶ 9-10.

## II.     SANCHEZ IS IN DEFAULT

As detailed above, on October 5, 2021, the Commission properly served Sanchez with the Summons and Complaint pursuant to the Court's September 29 Order.  Federal Rule of Civil Procedure 4(f)(3) permits service on an individual in a foreign country "by other means not prohibited by international agreement, as the court orders."  The Court ordered that the Commission could serve Sanchez by electronic mail and/or through the digital asset exchange at which Sanchez maintains an account.  (Dkt. No. 20, Part IV ("Order Authorizing Alternative Means of Service").)  The Commission served Sanchez with the September 29 Order, and all supporting pleadings and papers, on September 29, 2021, via email addresses belonging to Sanchez and also via Sanchez's digital asset exchange.  (Dkt. No. 22.)  The Commission served Sanchez with the Summons and Complaint on October 5, 2021 via email addresses belonging to Sanchez.  (Dkt. No. 34.)

Although Sanchez received the pleadings against him—indeed, his counsel contacted the Commission regarding those allegations (Snyder Decl. ¶¶ 18-21)—Sanchez has chosen not to appear in this action or to respond to the Complaint.  The Clerk of the Court has now certified that Sanchez has not answered or otherwise responded to the Complaint within the time limit established by Federal Rule of Civil Procedure 12(a)(1).  (Dkt. No. 38.)  Thus, Sanchez is now in default.

## III.    THE COMPLAINT ESTABLISHES SANCHEZ'S LIABILITY

### A.     Sanchez Violated Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Exchange Act Rule 10b-5

Section 17(a) of the Securities Act [15 U.S.C. § 77q], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5] prohibit insider trading. *SEC v. Obus*, 693 F.3d 276, 284-85 (2d Cir. 2012); *SEC v. Lyon*, 529 F. Supp. 2d 444, 453 (S.D.N.Y. 2008).  The Supreme Court has recognized two theories of insider trading:  the classical theory and the misappropriation theory.  *Obus*, 693 F.3d at 284-85.  The classical theory applies to a corporate insider who trades based on material, nonpublic information about the company "in

violation of the duty of trust and confidence insiders owe to shareholders." *Id.* at 284 (citing

*Chiarella v. United States*, 445 U.S. 222, 228 (1980)).  The misappropriation theory holds that a

person commits fraud in violation of Section 10(b) of the Exchange Act and Rule 10b-5 when that

person misappropriates material, nonpublic information for securities trading in breach of a duty

owed to the source of the information.  *Id.*  Thus, under either theory, a person violates Section

10(b) and Rule 10b-5,

> when he obtains (a) material, (b) nonpublic information intended to be used
> solely for a proper purpose and then (c) misappropriates or otherwise
> misuses that information (d) with scienter, (e) in breach of a fiduciary duty,
> or other duty arising out of a relationship of trust and confidence, to make
> "secret profits."

*SEC v. Gonzalez de Castilla*, 145 F. Supp. 2d 402, 412 (S.D.N.Y. 2001) (citing *Dirks v. SEC*, 463

U.S. 646, 654 (1983) and *United States v. Newman*, 664 F.2d 12 (2d Cir. 1981)).  The elements of a

claim under Section 17(a) are the same as the elements of a Section 10(b) claim.  *SEC v. First

Jersey Sec., Inc.*, 101 F.3d 1450, 1466-67 (2d Cir. 1996).

Here, the well-pleaded allegations of the Complaint, which are deemed admitted for the

purposes of the Commission's motion for a default judgment, establish that Sanchez violated

Securities Act Section 17(a), Exchange Act Section 10(b), and Exchange Act Rule 10b-5 by trading

securities using material, non-public information from the Investment Bank.

1.     ***Sanchez Obtained Material and Non-Public Information***

The information Sanchez obtained from the Investment Bank's Confidential Database was

material and nonpublic.  That information included highly sensitive details about pending or

potential corporate transactions involving Investment Bank clients, which the Investment Bank had

sought to keep confidential.  In particular, Sanchez used his access to the Confidential Database to

obtain non-public information about 45 publicly traded entities likely to be involved in upcoming

Investment Bank Deals, including 20 forthcoming mergers or acquisitions and 24 significant equity

offerings.  (Compl. ¶¶ 2, 37-41, 101; *see also* Rymas Decl. ¶¶ 12-13 & Exh. A.)  This is precisely the type of information that courts deem material and nonpublic.  *See, e.g.*, *Gonzalez de Castilla*, 145 F. Supp. 2d at 412 ("The Second Circuit has repeatedly held that specific information pertaining to a proposed corporate acquisition, tender offer, or merger is quintessentially material."); *Obus*, 693 F.3d at 289 n.3 ("Unannounced acquisitions are a prototypical example of material non-public information."); *see also SEC v. Materia*, 745 F.2d 197, 199 (2d Cir. 1984) ("Because even a hint of an upcoming tender offer may send the price of the target company's stock soaring, information regarding the identity of a target is extremely sensitive and zealously guarded."); *Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 495 F.2d 228, 237 (2d Cir. 1974) (investment banker had access to material information when working on a proposed public offering for the corporation).

      2.    ***Sanchez Misappropriated or Misused the Information by Trading on It***

Sanchez misappropriated or misused material, nonpublic information obtained from the Confidential Database by trading while in possession of such information.  *See Lyon*, 605 F. Supp. 2d at 547; *see also* 17 C.F.R. § 240.10b5-1 ("In insider trading cases, the 'on the basis of' requirement can be satisfied if 'the person making the purchase or sale was aware of the material nonpublic information when the person made the purchase or sale.'").

While working at the Investment Bank, Sanchez traded in the stocks of 45 companies involved in corporate events advised by the Investment Bank.  That trading followed a pattern. First, as described in the Complaint, according to access logs from the Confidential Database, Sanchez would access the portion of the Confidential Database that maintained highly sensitive, material, and nonpublic information about an upcoming Investment Bank Deal and the entities involved.  Sanchez would then log into one of the four brokerage accounts that he controlled, and would place trades in the securities of one of the entities for which he had accessed confidential

information, knowing that a transaction involving the entity was forthcoming.  Sanchez often timed his trades to be within days of the relevant announcement, and attempted to conceal those trades by effecting them in accounts nominally held in his parents' names.  After the relevant entity publicly announced the respective Investment Bank Deal, Sanchez would sell his entire securities position and obtain illegal profits.

Sanchez's pattern of well-timed round-trip trades in securities of entities involved in 45 Investment Bank Deals—trades made only after Sanchez accessed the Confidential Database and obtained confidential and sensitive information about the entities involved in those deals— demonstrates that he traded based on material, nonpublic information.  *See United States v. Larrabee*, 240 F.3d 18, 21 (1st Cir. 2001) (finding that "circumstantial evidence of a well-timed and well-orchestrated sequence of events, culminating with successful stock trades, creates a compelling inference of possession [of inside information] by the tipper"); *SEC v. Warde*, 151 F.3d 42, 47-48 (2d Cir. 1998) (finding that defendant's access to insider information, considered with a pattern of phone calls and stock purchases, provided sufficient evidence of insider trading); *SEC v. One or More Unknown Traders in Secs. of the Onyx Pharm., Inc.*, No. 13-cv-4645 (JPO), 2014 WL 5026153, at *7 (S.D.N.Y. Sept. 29, 2014) (finding inference of insider trading where trader had no prior history purchasing the securities at issue, yet made "remarkably well-timed and highly profitable" trades just before public announcement causing "stock to jump in value").

3.   ***Sanchez Breached Duties of Trust and Confidence That He Owed to the Investment Bank and Its Clients***

The Complaint demonstrates how Sanchez breached his fiduciary duty, or a similar duty of trust and confidence, under both the classical and misappropriation theories of insider trading.  The classical theory "involve[s] breaches, whether direct or derivative, of duties to shareholders of the insider's company." *United States v. Whitman*, 904 F. Supp. 2d 363, 366 (S.D.N.Y. 2012) (citing

16

*Obus*, 693 F.3d at 284).   Under the classical theory, insider trading liability is not limited to a

company's own employees.   Rather, it extends to outsiders (like the company's financial advisors),

who owe a fiduciary duty to the company's shareholders because the outsiders "have entered into a

special confidential relationship in the conduct of the business of the enterprise and are given access

to information solely for corporate purposes."   *Dirks*, 463 U.S. at 655 n.14 (1983).   Courts extend

"temporary insider" status to financial advisors like the Investment Bank.   *SEC v. Cuban*, 620 F.3d

551, 554 (5th Cir. 2010); *see also Gonzalez de Castilla*, 145 F. Supp. 2d at 413 ("As a general

matter, insider trading cases hold that a duty arises in cases where the person is . . . a 'temporary

insider . . . .'").   The Investment Bank's clients granted it and its employees "access to information

solely for corporate purposes."   *Dirks*, 463 U.S. at 655 n.14.   Thus, the Investment Bank, and its

employees entrusted with the confidential corporate information, including Sanchez, are temporary

insiders of each of the Investment Bank's clients.

The misappropriation theory "targets persons who are not corporate insiders but to whom

material non-public information has been entrusted in confidence and who breach a fiduciary duty

to the source of the information to gain personal profit in the securities market."   *Obus*, 693 F.3d at

284.   The paradigmatic misappropriation case involves an employee who—when entrusted by his

employer with confidential information—owes a duty of loyalty and confidentiality to his employer.

*See, e.g.*, *United States v. O'Hagan*, 521 U.S. 642, 654-656, 659 (1997) (holding that a law firm

employee could be held criminally liable for insider trading on misappropriation theory where he

breached a duty of loyalty and confidentiality to his law firm employer).   Under the

misappropriation theory, "the defendant['s] undisclosed embezzlement or 'misappropriation' of

market-sensitive confidential information from [his] employer[]" for insider trading defrauds the

employer.   *Whitman*, 904 F. Supp. 2d at 367.

Under either theory, Sanchez breached a fiduciary or similar duty for personal benefit. The Investment Bank entrusted Sanchez with access to confidential information about its corporate clients and Investment Bank Deals involving those clients.  This information included the Investment Bank's collective knowledge of its clients and client counterparties likely to be involved in upcoming Investment Bank Deals, the details of those Investment Bank Deals (*e.g.*, the nature and size of the transaction, and the dollar amount to be paid), and the date on which the Investment Bank Deals would be announced.  In 2019, 2020, and 2021, Sanchez undertook trainings regarding his duty to maintain the Investment Bank's client confidences.  He certified that he completed those trainings and that he would adhere to firm policies that prohibited him from trading on material, nonpublic information learned in the course of his role as compliance analyst (indeed, prohibiting him from trading at all without having each trade pre-cleared by the Investment Bank and, even then, only in brokerage accounts that had been disclosed to the Investment Bank).  Moreover, Sanchez's very job was to monitor and track this highly sensitive information in order to prevent its misuse by Investment Bank employees, including unlawful securities trading.  Nonetheless, Sanchez traded on confidential Investment Bank Deal information for substantial profits of at least $471,725.65.

Thus, under the classical theory, Sanchez breached his duty to the shareholders of the Investment Bank's clients when he traded in the securities of those companies.  While under a misappropriation theory, Sanchez breached his duty to the Investment Bank when he traded in the securities of all 45 relevant companies.

### 4. *Sanchez Acted With Scienter*

Sanchez also acted with the requisite scienter—*i.e.*, a "mental state embracing intent to deceive, manipulate, or defraud," *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976). One who trades in securities possessing information that he knows or has reason to know is confidential

and was improperly obtained, or who trades in reckless disregard of these facts, acts with scienter. *See, e.g.*, *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 44-46 (2d Cir. 1978). The law does not require direct evidence of scienter.  Rather, in securities fraud cases like this one, "circumstantial evidence can be more than sufficient" to prove scienter, particularly given "the difficulty of proving the defendant's state of mind."  *Herman & MacLean v. Huddleston*, 459 U.S. 375, 391 n.30 (1983). This is especially true in insider trading cases:  "Proof of insider trading can well be made through an inference from circumstantial evidence and not solely upon a direct testimonial confession." *SEC v. Singer*, 786 F. Supp. 1158, 1164 (S.D.N.Y. 1992).

The Complaint's allegations, deemed admitted on this motion, demonstrate Sanchez's scienter when trading on nonpublic information from the Confidential Database.  Sanchez knew that Confidential Database information concerning pending Investment Bank deals was material and nonpublic.  The Investment Bank provided Sanchez with multiple policies and trainings—each of which he attested that he received and understood—informing him that information about the Investment Bank's clients must be held in strict confidence and could not be used for his personal benefit.  Moreover, Sanchez knew that his trading on information about the Investment Bank Deals violated a confidence because the Investment Bank repeatedly told him that he could not disclose or personally profit from any information learned at the firm.  The fact that Sanchez hid his trading from the Investment Bank by using accounts that were not in his own name, but which he controlled, and by failing to pre-clear the trades with the Investment Bank—all in violation of the Investment Bank's trading policies—further underscores that he knew that his trading violated a confidence.  Finally, and perhaps most notably, as a compliance analyst, Sanchez knew that his access to the Confidential Database was intended to help the Investment Bank protect client confidences and to prevent others from violating those confidences.  Instead, Sanchez misused that access for his own benefit.  These facts demonstrate Sanchez's scienter.

19

In sum, Sanchez obtained material, nonpublic information from the Investment Bank regarding Investment Bank clients, then misappropriated or misused that information with scienter, and in breach of duties owed to the Investment Bank and the shareholders of the Investment Bank's clients, by trading on that information.  This conduct violates Securities Act Section 17, Exchange Act Section 10(b), and Exchange Act Rule 10b-5.

### B.    Sanchez Violated Section 14(e) of the Exchange Act and Rule 14e-3 Thereunder

Section 14(e) of the Exchange Act [15 U.S.C. § 78n(e)] and Rule 14e-3 thereunder [17 C.F.R. § 240.14e-3] prohibit insider trading in the context of tender offers.  "If any person has taken a substantial step or steps to commence, or has commenced, a tender offer," the rule prohibits purchases or sales of securities by

> any other person who is in possession of material information relating to such tender offer which information he knows or has reason to know is nonpublic and which he knows or has reason to know has been acquired directly or indirectly from [the offeror, the offeree, or anyone acting on behalf of either of them] . . . unless within a reasonable time prior to any purchase or sale such information and its source are publicly disclosed by press release or otherwise.

17 C.F.R. § 240.14e-3(a)(1)-(3).  Rule 14e-3 prohibits any person with such information from trading regardless of whether they owe a fiduciary duty with respect to the confidentiality of that information.  *See U.S. v. Chestman*, 947 F.2d 551, 557-60 (2d Cir. 1991).  A trader need not know that the information relates to a tender offer to be liable under these provisions.  *See, e.g.*, *SEC v. Sargent*, 229 F.3d 68, 78-79 (1st Cir. 2000); *SEC v. Anticevic*, No. 05-cv-6991 (KMW), 2010 WL 2077196, at *5 (S.D.N.Y. May 14, 2010).

In addition to establishing that Sanchez violated Section 10(b) and Rule 10b-5, as above, the Commission must prove three additional elements to establish that Sanchez violated Section 14(e) and Rule 14e-3, that: (1) "substantial steps to commence" a tender offer had been taken before Sanchez traded; (2) Sanchez's material, non-public information was "relating to such tender offer";

and (3) Sanchez knew or had reason to know that he received the information from the offeror, offeree, or someone working on behalf of one of them.  17 C.F.R. § 240.14e-3(a); *see also SEC v. Musella*, 578 F. Supp. 425, 443 (S.D.N.Y. 1984) (specifying elements of Rule 14e-3 claim). Meetings between the parties regarding the potential tender offer, retention of outside experts, and execution of consulting, confidentiality, or other preliminary agreements are all "substantial steps" towards a tender offer.  *See SEC v. Mayhew*, 121 F.3d 44, 53 (2d Cir. 1997).

Here, Sanchez violated Section 14(e) of the Exchange Act and Rule 14e-3 by purchasing AMAG and VIE securities—and the securities of a third Investment Bank client, HD Supply Holdings ("HDS"), which was acquired by The Home Depot—based on inside information regarding those entities' involvement in pending tender offers.  (Compl. ¶¶ 50-55, 64-67, 98; *see also* Rymas Decl. ¶¶ 16-21 & Exh. A (rows 7, 12, and 20).)  In each case, Sanchez's trading occurred after the companies had taken "substantial steps to commence" the tender offer, including the retention of the Investment Bank, signing of confidentiality agreements, conducting due diligence, negotiating the tender offer price, discussing the proposed combination with a board of directors.  (*See* Compl. ¶¶ 52, 66, 99; Rymas Decl. ¶¶ 16-21.)

The second and third additional elements of Rule 14e-3 are also clearly satisfied.  The information contained in the Confidential Database specifically related to the AMAG, VIE, and HDS tender offers.  (Compl. ¶ 34.)  And, the Confidential Database indicated that the Investment Bank had been retained by the offeror, the offeree, or a shareholder of the offeror.  (*Id*.)  In other words, Sanchez knew, or was reckless in not knowing, considering his extensive daily experience working with the Confidential Database, that he received the information from the Investment Bank, which was working on behalf of the offeror, the offeree, or a shareholder of the offeror for each deal.  Thus, Sanchez's conduct plainly violated Exchange Act Section 14(e) and Rule 14e-3.

IV.     **THE COURT SHOULD GRANT THE RELIEF SOUGHT**

The Court should issue a final judgment against Sanchez permanently enjoining him from

future securities law violations, ordering him to pay disgorgement equal to his unlawful trading

profits, and imposing a civil monetary penalty of three times his ill-gotten gains.

A.     **Sanchez Should be Enjoined from Future Violations of the Securities Laws**

Section 21(d) of the Exchange Act authorizes the Court to issue permanent injunctive relief

for violations of the federal securities laws.  *See* 15 U.S.C. § 78u(d).  Such relief is appropriate

"'when the defendant's past conduct indicates . . . that there is a reasonable likelihood of further

violation in the future.'"  *SEC v. Aly*, No. 16-cv-3853 (PGG), 2018 WL 4853031, at *2 (S.D.N.Y.

Oct. 5, 2018) (quoting *SEC v. Commonwealth Chem. Sec., Inc.*, 574 F.2d 90, 99 (2d Cir. 1978)); *see*

*also SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1100 (2d Cir. 1972).  "To determine

whether a permanent injunction is appropriate, a court should consider:

> [(1)] the fact that defendant has been found liable for illegal conduct; [(2)]
> the degree of scienter involved; [(3)] whether the infraction is an "isolated
> occurrence;" [(4)] whether defendant continues to maintain that his past
> conduct was blameless; and [(5)] whether, because of his professional
> occupation, the defendant might be in a position where future violations
> could be anticipated.

*Aly*, 2018 WL 4853031, at *2-3 (quoting *Commonwealth Chem. Sec., Inc.*, 574 F.2d at 100).

In assessing injunctive relief, the public interest is paramount.  *SEC v. Fowler*, 440 F. Supp. 3d 284,

302 (S.D.N.Y. 2020).

These factors heavily favor injunctive relief.  Sanchez is liable for illegal conduct and acted

with scienter.  His insider trading was neither an accident nor an isolated occurrence—he traded in

front of 45 transactions.  The Investment Bank employed Sanchez to assist its efforts to prevent

misuse of its material non-public information and, instead, he abused his position of trust to misuse

that information for his own gain, attempting to conceal his trading in four brokerage accounts in

his parents' names.  Sanchez has not appeared in this case and has taken no responsibility for his

violations of the federal securities laws.  *See, e.g.*, *SEC v. One or More Unknown Traders in the Common Stock of Certain Issuers*, No. 08-cv-1402(KAM), 2009 WL 3233110, at *5 (E.D.N.Y. 2009) ("[W]here, as here, a party has failed to appear, that party fails to recognize his wrongdoing and provide assurances against further violations.") (internal quotations omitted); *cf. Aly*, 2018 WL 4853031, at *3.  Finally, Sanchez, who is in his mid-30s and has worked at multiple financial institutions (Rymas Decl. ⁋ 8), may well be in a position to engage in insider trading again.[6]  Thus, a permanent injunction against future violations of Securities Act Section 17(a), Exchange Act Sections 10(b) and 14(e), and Exchange Act Rules 10b-5 and 14e-3 is warranted.

### B.    The Court Should Order Sanchez to Pay Disgorgement and Pre-Judgment Interest

Disgorgement as an equitable remedy is imposed to force a defendant to give up the amount by which he was unjustly enriched.  *SEC v. Rust*, No. 16-cv-3573 (ER), 2021 WL 2850615, at *3 (S.D.N.Y. July 8, 2021).  The Court has broad discretion in calculating the amount a defendant should pay in disgorgement.  *Id.*; *SEC v. Cope*, No. 14-cv-7575 (DLC), 2021 WL 653088, at *2 (S.D.N.Y. Feb. 19, 2021).  The Commission is not required to establish with certainty the disgorgement amount, but need only show "a reasonable approximation of profits causally related to the fraud."  *Cope*, 2021 WL 653088, at *2.  The burden then shifts to the defendant to prove that the requested disgorgement is not a reasonable approximation of the unjust enrichment.  *Id.*   In support of this motion, the Commission has submitted the declaration of John Rymas, an Analysis and Detection Investigator in the Market Abuse Unit of the Commission, who has analyzed the relevant trading records and has attached to his declaration a calculation of Sanchez's illicit trading profits.  (*See* Rymas Decl. ⁋⁋ 1, 14 & Exh. A.)  Sanchez profited from his unlawful insider trading, obtaining unlawful profits of at least $471,725.65.  (*Id.* ⁋ 14 & Exh. A.)  Thus, Sanchez should be

---

[6] Sanchez is neither an infant nor incompetent.  *See* Snyder Decl. ⁋ 11; *see also* Dkt. No. 37, ⁋ 7.

ordered to pay this amount as disgorgement for that unlawful insider trading.

The Commission further requests that the Court award prejudgment interest on any disgorgement it orders.  The Court has discretion in awarding prejudgment interest, and if so, the appropriate interest rate thereon.  *See Rust*, 2021 WL 2850615, at *3.  Prejudgment interest is important to deny the wrongdoer his unlawful gains.  *SEC v. Dang*, No. 20-cv-01353 (JAM), 2021 WL 1550593, at *7 (D. Conn. Apr. 19, 2021).  "When the SEC itself orders disgorgement, which as discussed above is designed to strip a wrongdoer of its unlawful gains, the interest rate it imposes is generally the IRS underpayment rate."  *First Jersey Sec.,* 101 F.3d at 1476; *see also SEC v. Chan*, 465 F. Supp. 3d 18, 41 (D. Mass. 2020).  Accordingly, the Commission respectfully requests the Court award prejudgment interest of $14,330.89 against Sanchez.  (Rymas Decl. ¶ 15 & Exh. A.)

## C.      <u>The Court Should Enter the Maximum Civil Penalty against Sanchez</u>

Finally, the Court should order Sanchez to pay the maximum civil penalty.  Section 21A of the Exchange Act "authorizes the SEC to seek, and the district court to impose, a civil penalty for insider trading—*i.e.*, for 'purchasing or selling a security . . . while in possession of material, nonpublic information . . . .'"  *SEC v. Rosenthal*, 650 F.3d 156, 159 (2d Cir. 2011) (quoting 15 U.S.C. § 78u-1(a)(1)).  Under Section 21A, the amount of penalty "'shall be determined by the court in light of the facts and circumstances,' and 'shall not exceed three times the profit gained or loss avoided as a result of such unlawful purchase, sale, or communication.'"  *Id.* (quoting 15 U.S.C. § 78u-1(a)(2)).  In making this determination, courts consider factors such as

> (1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; and (5) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition.

*SEC v. Kinnucan*, 9 F. Supp. 3d 370, 377 (S.D.N.Y. 2014) (quoting *SEC v. Rajaratnam*, 822 F. Supp. 2d 432, 433 (S.D.N.Y. 2011)).

In this case, three times Sanchez's profits equals $1,415,176.95.  *See* Rymas Decl. ⁋ 14 (Sanchez's profits equaled $471,725.65).  The maximum civil penalty is appropriate.  Sanchez repeatedly abused his position of trust at the Investment Bank, over several months, to trade in front of at least 45 transactions in which the Investment Bank was involved.  Rather than come forward to face the charges brought by the Commission, he has chosen not to respond.  The Commission does not believe Sanchez's financial condition provides any reason to reduce the penalty—Sanchez is 35 years old and has worked for multiple financial institutions, (Rymas Decl. ⁋ 8).  Moreover, because of his failure to appear, Sanchez has not demonstrated any need to reduce the penalty due to his financial condition.  Under these circumstances, the Court should order Sanchez to pay the maximum civil penalty.  *See Kinnucan*, 9 F. Supp. 3d at 377 (imposing maximum three time penalty for conduct that was egregious and involved a high degree of scienter); *see generally Rajaratnam*, 822 F. Supp. 2d at 434 ("SEC civil penalties, most especially in a case involving such lucrative misconduct as insider trading, are designed, most importantly, to make such unlawful trading a money-losing proposition not just for this defendant, but for all who would consider it, by showing that if you get caught . . . you are going to pay severely in monetary terms.").

**D.      Frozen Assets Should be Paid to the Commission
          in Partial Satisfaction of the Requested Judgment**

The Court previously froze U.S. based assets of Defendant Sanchez, including assets held nominally by Relief Defendants Abellan and Gonzalez (but which belong to Sanchez), to ensure that those assets would be available to satisfy an eventual judgment for disgorgement or penalty. (*See* Dkt. Nos. 20, 28.)  Relief Defendants Abellan and Gonzalez have released any interested in those assets.  (*See* Abellan Stip. and Proposed Order; Gonzalez Stip. and Proposed Order.)  The Commission requests that the previously frozen assets be paid to the Commission in partial satisfaction of the disgorgement, prejudgment interest, and civil penalties requested here.

## **CONCLUSION**

For the foregoing reasons, the Commission respectfully requests that the Court enter the attached proposed order finding Sanchez in default, permanently enjoining him from future securities law violations, ordering him to pay disgorgement plus prejudgment interest, and imposing the maximum civil penalty.

Dated: New York, New York
       March 1, 2022

   _s/ Assunta Vivolo_____
Joseph G. Sansone
Assunta Vivolo
David Snyder (admitted *pro hac vice*)
Christopher M. Colorado
Securities and Exchange Commission
Philadelphia Regional Office
1617 JFK Boulevard, Suite 520
Philadelphia, Pennsylvania 19103
(215) 597-1047 (Vivolo)
VivoloA@sec.gov